**[Cite as *State v. Plott*, 2017-Ohio-38.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,            CASE No.  13-15-39

     v.

RAYMOND F. PLOTT,              O P I N I O N

     DEFENDANT-APPELLANT.

---

STATE OF OHIO,

     PLAINTIFF-APPELLEE,            CASE No.  13-15-40

     v.

RAYMOND F. PLOTT,               O P I N I O N

     DEFENDANT-APPELLANT.

---

**Appeals from Seneca County Common Pleas Court**
**Trial Court Nos. 13-CR-0142 and**
**15 CR 0097**

**Judgments Affirmed**

**Date of Decision:    January 9, 2017**

---

APPEARANCES:

    *Joseph C. Patituce* **for Appellant**

    *Derek W. DeVine* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Raymond Plott ("Plott"), brings these appeals from the October 30, 2015, judgments of the Seneca County Common Pleas Court sentencing him to an aggregate 10-year prison term after he was found guilty in a jury trial of one count of Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, one count of Domestic Violence in violation of R.C. 2919.25(A), (D)(4), a felony of the third degree due to Plott having two prior Domestic Violence convictions, and one count of Abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree. On appeal, Plott argues that (1) the State improperly introduced evidence of his pre-arrest silence; (2) the trial court erred in denying his motions for acquittal; (3) the State improperly introduced opinion testimony; (4) the State improperly impeached its own witness; (5) the trial court erred in allowing a witness to testify as a strangulation expert; (6) the trial court improperly commented that his counsel was dishonest; (7) the trial court erred in granting the State's "Motion for Consolidation" and denying his motion to sever; (8) his convictions are against the manifest weight of the evidence; and (9) the State committed prosecutorial misconduct.

*Relevant Facts and Procedural History*

{¶2} On August 29, 2013, the Seneca County Grand Jury indicted Plott on two counts of Rape in violation of R.C. 2907.02(A)(2), both felonies of the first

degree.[1]   The charges stemmed from allegations that Plott had sexually assaulted K.D. at Plott's residence on or about July 6, 2013.

{¶3} Following a mistrial on those charges, the Seneca County Grand Jury issued a second indictment against Plott alleging one count of Domestic Violence in violation of R.C. 2919.25(A), (D)(4), a felony of the third degree, and one count of Abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree.[2]   The charges stemmed from allegations that Plott had also assaulted his fiancé, Julia Mele, on the same night Plott had allegedly raped K.D.

{¶4} On June 8, 2015, the State moved to consolidate the two cases for trial. That same day, after Plott was arraigned on the new charges, a hearing was held on the State's motion, where the following exchange occurred:

> **The Court: Now, there is also a motion for consolidation of cases for purposes of jury trial.  That being 13 CR 0142 and 15 CR 0097.  Court has your motion.  Anything further?**
>
> **[The Prosecutor]: No, Your Honor.**
>
> **The Court: Any objection?**
>
> **[Defense Counsel]: No, Your Honor.**
>
> **The Court:  Thank you.  The Court grants the motion to consolidate for purposes of trial, and both cases will be tried on the same date and time * * *.**

June 8, 2015 Hrg., p. 8-9.

---

[1] The Rape allegations correspond to appellate case number 13-15-39.
[2] The Domestic Violence and Abduction allegations correspond to appellate case number 13-15-40.

{¶5} On September 9, 2015, just five days before trial, Plott filed a motion to sever, arguing that joinder was improper under the Criminal Rules of Procedure and he was prejudiced thereby.

{¶6} On the morning of trial, a hearing was held on Plott's motion to sever and Plott's motion was ultimately denied. The case then proceeded to trial, where the following relevant evidence was presented.

{¶7} Lieutenant Jason Windsor of the Tiffin Police Department was the first witness to testify on behalf of the State. He testified that on July 7, 2013, he was called into work to investigate an alleged sexual assault at Lot 107 of the Highland Trailer Court ("the residence"). He stated that through his investigation, he learned that Plott, Mele, and K.D., the alleged victim, lived at the residence. He stated that he spoke with K.D. at the hospital, where he obtained her statement and photographed her injuries. He added that he later obtained a warrant to search the residence.

{¶8} Lieutenant Windsor testified that he also interviewed Mele after learning that she had been assaulted by Plott that evening. He stated that he observed "some prominent bruising to [Mele's] neck." Trial Tr., p. 153. He stated that the bruising was on the left side of her neck, going slightly to the rear. Lieutenant Windsor testified that he photographed Mele's injuries and those photographs were later introduced into evidence.

{¶9} Lieutenant Windsor testified that Mele was not cooperative with the investigation insofar as there was an allegation that she was trying to get K.D. to change her statement. He added that "victims of domestic violence are known to frequently recant their statements to protect their abusers." Trial Tr., p. 152.

{¶10} Finally, Lieutenant Windsor testified that he spoke with Plott over the phone the day after the alleged assaults. He stated, "[Plott] said he was coming to turn himself in and that he wasn't going to talk to me without his attorney." *Id*. at p. 158. He added that he later obtained a warrant to collect Plott's DNA. At this point in the trial the stipulations were read to the jury that had been reached between the parties. It was stipulated to a reasonable degree of scientific certainty that a semen sample taken from a vaginal swab of K.D. matched Plott's DNA. It was also stipulated that Plott had two prior convictions for Domestic Violence.

{¶11} On cross-examination, Lieutenant Windsor was asked about the evidence linking Plott to Mele's injuries. Defense counsel asked whether Lieutenant Windsor had any evidence that Plott attempted to strangle Mele and he responded that he had Mele's statement and the injuries to K.D.'s neck.

{¶12} Detective Rachel Nye of the Tiffin Police Department was the second witness to testify on behalf of the State. Detective Nye testified that on July 7, 2013, she was called into work to assist Lieutenant Windsor with his investigation of an alleged rape. She stated that she spoke with K.D. at the hospital and took

photographs of K.D.'s bruised arms and legs. She added that she also picked up K.D.'s rape kit from the hospital and took it to the police station.

**{¶13}** Megan Homan, a Registered Nurse and Sexual Assault Nurse Examiner, was the third witness to testify on behalf of the State. She testified that on July 7, 2013, she performed a sexual assault examination of K.D., which included documenting the bruises on K.D.'s body, specifically on K.D.'s arms and legs, and swabbing K.D.'s body for possible DNA. Homan testified that during the examination K.D. was "quiet," and "[a]t times she was tearful." Trial Tr., p. 197. Homan's report was introduced into evidence.

**{¶14}** On cross-examination, Homan testified that K.D. informed her during the examination that Plott had penetrated her once with his genitals. The statement that Homan took from K.D. indicated that Plott had initially digitally penetrated K.D. and then later turned her on her side and penetrated her with his genitals.

**{¶15}** Jody Noon, a friend of Mele's, was the fourth witness to testify on behalf of the State. Noon testified that she was with Mele and Plott at the Eagles, a local bar, on July 6, 2013. Noon testified that Plott was told to leave the bar that evening because he was getting loud. Noon testified that before Mele and Plott left the bar, Noon did not observe any marks on Mele's neck.

**{¶16}** Noon testified that Mele called her later in the evening, "crying and upset," stating that Mele needed a ride from Plott's residence because Plott had "hurt

her," and that it was "urgen[t]." Trial Tr., p. 241. Noon testified that she went and picked up Mele and that when she did, she noticed marks on Mele's neck that she had not seen earlier that night.

{¶17} On cross-examination, Noon testified that Mele told her that she and Plott had been at the Eagles earlier that day for approximately 12 hours. Noon testified that she left Mele at the Eagles around 11:45 p.m. but met Mele back at the Eagles the following afternoon and Noon eventually took Mele to the police station.

{¶18} On re-direct, Noon testified that she had offered to take Mele to the police station when she picked Mele up from the residence on the night of the alleged incident, but Mele declined.

{¶19} On re-cross, Noon stated that Mele told her the following afternoon that the police were calling her, but she was not going to answer.

{¶20} On re-direct, she stated that Mele had found out that Plott had done something wrong.

{¶21} K.D. was the fifth witness to testify on behalf of the State. K.D. testified that she was originally from Carey, Ohio but had been living in Kentucky with her fiancé. She stated that in May of 2013 she left Kentucky and moved in with Mele, and Mele's fiancé, Plott. K.D. testified that Mele was a "real good" friend of hers and that she had been for "a few years." Trial Tr., p. 257.

{¶22} K.D. testified that on the evening of July 6, 2013, she was alone at the residence she shared with Plott and Mele. K.D. testified that she had taken medication for sleep and anxiety when Plott and Mele arrived back at the residence. She stated that Plott appeared "very aggravated, agitated. Just raging." *Id.* at p. 259. She stated that as Plott and Mele entered the residence, Plott kicked, pushed, or shoved Mele through the doorway. She explained, "[Plott] kept telling her to get up and he kept kicking her and telling her to get up. And she was saying she couldn't." *Id.* She testified specifically that Plott choked Mele and pulled her hair. K.D. added that when she picked up her phone, Plott threatened "to get [her], too" and eventually took her phone. *Id.*

{¶23} K.D. testified that she went to her bedroom, but Plott followed her and cornered her between her nightstand and her dresser. She explained, "[Plott] was telling me that he was going to kill me and that he was going to wrap my body in plastic and throw it in the river." *Id.* at p. 262. She testified that Plott asked her to come up with reasons why she deserved to live and she told him that she had children and grandchildren and had taken care of her dying mother. She added that Plott hit her face and arms and knocked her glasses off of her face.

{¶24} K.D. testified that Mele eventually came into the bedroom too but dropped her purse, causing its contents to fall out. K.D. testified that Plott "made

[Mele] get down on all fours and made her crawl." *Id.* at p. 262. K.D. added that Plott was also "making [Mele] like kiss [her] feet and things * * *." *Id.* at p. 263.

{¶25} K.D. testified that Plott eventually calmed down and went into the living room, but she did not leave the residence because she had taken medications that prevented her from driving and Mele could not drive because she had been drinking all day. K.D. added that she also did not want to let Plott see her because she "was scared of what he would do." *Id.* at p. 264.

{¶26} K.D. testified that she went to bed but later awoke to Plott standing next to her. She testified that Plott told her that Mele had left the residence and that they were alone. K.D. explained that Plott came in and out of her room "three or four" times, trying to convince her to engage in sexual activities. Trial Tr., p. 267. She stated that Plott told her that he would leave if she let him do it once. K.D. testified that she told Plott no. K.D. stated that after the third or fourth time, Plott said "I guess I'll have to rape you." *Id.* at p. 268.

{¶27} K.D. testified that Plott pulled the covers off of her, climbed on top of her, penetrated her with his genitals, and ejaculated. K.D. testified that she "plead[ed] over and over to please stop." *Id.* at p. 269. She stated that when he finished, he left her bedroom and went back to the living room. She added that Plott came back to her room later and stated that he wanted to have sex with her again. She stated, "I still asked him not to, and he pulled my body to the side of the bed

and penetrated me that way with me on my side." *Id.* at p. 270. K.D. testified that Plott told her not to say anything so that when Mele was not home they could "continue to do things." *Id.* at p. 271.

{¶28} On cross-examination, K.D. testified that the night before the alleged rapes she had gone to a bar with Mele and Noon. She stated that Mele and Noon wanted to stay until the bar closed, but she did not want to so she left and stayed the night at her friend's house. She added that she went back to the residence the next morning after going to the Eagles and picking up a house key from Mele.

{¶29} K.D. reiterated that she took several sleeping medications around 9:00 p.m. on the night of the alleged sexual assaults. She added that the medications prevent her from driving but do not impair her overall ability to function. K.D. stated that the rapes occurred in the early morning hours within 30 minutes of each other and that Plott ejaculated both times. She added that she allowed Plott to kiss and touch her when he was in her room because he told her that he would leave if she did.

{¶30} Mele was the sixth witness to testify on behalf of the State. She testified that she and Plott were engaged and the two lived together at the residence, along with K.D. She testified that she remembered leaving the bar with Plott at some point on the evening of July 6, 2013 and going back to the residence, where K.D. was. She added, however, that she did not remember how she got the marks

on her neck. She stated, "I, I know I fell the day before, but I don't know if it was from that or if anything happened to me that night. I don't know." *Id*. at p. 368. Mele indicated that she had fallen on her knees into a "bush thing," and it was possible that she received the injuries to her neck that way on the day prior to the alleged incident. *Id*. at p. 368-369.

**{¶31}** Mele initially testified that she did not remember her interview with Lieutenant Windsor. She explained, "I remember being there. I don't remember our conversation. I know he was asking me questions, but what I was saying, I don't know. Like I said, I was still drunk then, too." *Id*. at p. 369. Then, the following colloquy took place:

> **[The Prosecutor]: If you had an opportunity to view the conversation today, would that refresh your recollection?**
>
> **[Mele]: It probably will not because it's just showing me what I said. I'm not going to remember without seeing it, I'm not going to remember it. I don't think it's going to bring back my memory of what I said. What I said is what I said. It might have happened at that point, but as time goes by, two years later, I'm thinking I don't remember what actually happened.**
>
> **[The Prosecutor]: And that's not, that's okay, [Mele]. That's not what I'm asking you. I'm asking you, you indicated you don't remember what you said?**
>
> **[Mele]: I don't remember what I said. I don't remember.**
>
> **[The Prosecutor]: To Lieutenant Windsor?**
>
> **[Mele]: No.**

> **[The Prosecutor]: Okay. You're testifying in front of the jury that actually viewing your conversation and a video recording of your conversation with Lieutenant Windsor, seeing that, that would not help you remember what you said to Lieutenant Windsor?**
>
> **[Mele]: It would probably help me - - I would see what I said, but I don't know if it's what I remember what I said. You know what I'm - - I'm trying to explain this better. But showing me the video is only going to show me what I said. But without the video, I'm not going to, I wouldn't remember what I said.**
>
> **[The Prosecutor]: Right. So the video will help you know what you said? I just want to make sure we're clear.**
>
> **[Mele]: Sure would, seeing it.**

*Id*. at p. 369-371.

**{¶32}** Thereafter, the jury was excused, and the State played the video of Mele's interview with Lieutenant Windsor. After the video was played, the jury returned, and the prosecutor asked whether Mele's recollection was refreshed. Mele equivocated, first stating that she still did not "remember our interview[.]" *Id*. at p. 410. However, she would go on to waver between saying she did not remember the interview or what happened and saying that she remembered certain "parts of it" and certain events from the night in question, just nothing related to whether Plott actually harmed her. *Id*.

**{¶33}** As to the incident in question, Mele testified that she remembered some things, such as being on the floor of the residence and K.D. "giggling" on the couch at one point. *Id*. at p. 415. Mele emphasized that she did not know how she

got the marks on her neck. She testified, "I know I fell, so I can't, I can't say 100 percent [Plott] did it and I can't say 100 percent he didn't do it." *Id*. at p. 416.

{¶34} On cross-examination, Mele testified that the day before the incident she had gone out to a bar with K.D. and Noon. She stated that K.D. and Noon eventually left the bar, but she stayed until closing. She added that she stayed at her friends' house that night and met Plott the following morning at the Eagles where she drank all day.

{¶35} She testified that she did not remember whether she and Plott were arguing about K.D., but she remembered wanting to leave the residence. She added that K.D. must have known that she was leaving the residence because Mele was getting ready to go. Mele stated that Plott never prevented her from leaving the residence or told her that she had to stay.

{¶36} Mele testified that she did not remember whether Plott said he was going to kill her or whether he choked her. She further testified that she did not remember Plott hitting K.D. She stated that she thought she saw Plott hit K.D. but it was only a shadow, so Mele did not directly observe any actual strikes. She stated that Plott was very upset with K.D. and was yelling at her to leave, but K.D. was on the couch giggling and laughing with Plott later that night before Mele left.

{¶37} On re-direct Mele testified that she did remember Plott asking K.D. what "good" she had done in life. *Id*. at p. 429.

{¶38} Ruth Downing was the final witness to testify on behalf of the State. After being recognized as an expert on the identification and effects of strangulation, she testified that Mele's injuries to her neck were consistent with a strangulation injury to a reasonable degree of scientific certainty.

{¶39} Upon the conclusion of Downing's testimony, the State rested. At that time, Plott renewed all previous motions and objections, which the trial court denied and overruled, respectively. Plott also moved for an acquittal on all charges pursuant to Crim.R. 29, which the trial court denied.

{¶40} Plott then testified as the defense's sole witness. He testified that he and Mele were not engaged and had not recently had any sexual relationship. He stated that they were in a relationship more than one year ago, but they were now just friends.

{¶41} Plott testified that the night before the alleged assaults occurred, Mele and Noon went out to a bar. He stated that at 3:00 a.m., Mele called him and asked him to come pick her up because K.D. had left her at a bar. He stated that he told Mele that he could not pick her up until later that morning.

{¶42} Plott testified that when he saw Mele the next day, he noticed a few marks on her neck. He stated that he and Mele got into an argument about what had happened to her but Mele could not remember. He added that he was upset with K.D. for abandoning Mele.

{**¶43**} Plott testified that he and Mele eventually went to the Eagles where they stayed until about 8:30 p.m. He added that he "had a buzz on." *Id*. at p. 482. He testified that when they got back to the residence, he and Mele continued to argue. He stated that Mele was concerned that he was going to make K.D. leave the residence immediately. He added that during their argument, he never pushed, kicked, or choked Mele. He testified that after they finished arguing, Mele left. He added that around this time, K.D. was seated on the couch "just making jokes and kidding around." *Id*. at p. 486.

{**¶44**} Plott testified that after Mele left, he went to bed but later awoke to make some dinner. He explained that after he finished eating, K.D. "came up behind [him] and put her arms around [him] and started kissing on [his] neck and stuff." *Id*. at p. 491. He stated that they ended up back in her bedroom where they had consensual sex. He added that he never forced himself on her or threatened her in any way.

{**¶45**} Plott admitted that he had previously pleaded guilty to two domestic violence charges because he was guilty of those offenses but stated that he did not enter pleas of guilty in these cases because he did not commit the offenses, "plain and simple." *Id*. at p. 477.

{¶46} On cross-examination, Plott stated that Mele was his girlfriend insofar as he had not been with anyone since her, and he cared for her. He added that they did not have a sexual relationship and did not sleep in the same bed.

{¶47} Upon the conclusion of Plott's testimony, the defense rested, and Plott renewed all previous motions and objections, which the trial court denied and overruled, respectively. The case was then submitted to the jury.

{¶48} Ultimately the jury found Plott guilty of one count of Rape, Domestic Violence, and Abduction. He was acquitted of the second count of Rape.

{¶49} On October 26, 2015, Plott's sentencing hearing was held. At the hearing it was determined that the Domestic Violence and Abduction charges should merge for purposes of sentencing, and the State elected to proceed to sentence on the Domestic Violence charge. Plott was ultimately ordered to serve 8 years in prison on the Rape conviction and 24 months in prison on the Domestic Violence conviction, consecutive to each other, for an aggregate 10-year prison term. Judgment Entries memorializing Plott's sentences were filed on October 30, 2015. It is from these judgments that Plott appeals, presenting the following assignments of error for our review.

### *Assignment of Error No. I*

**THE STATE OF OHIO IMPROPERLY INTRODUCED APPELLANT'S PRE-ARREST SILENCE AS SUBSTANTIVE EVIDENCE OF GUILT IN VIOLATION OF APPELLANT'S RIGHT TO REMAIN SILENT UNDER THE FIFTH AND**

**FOURTEENTH AMENDMENTS TO THE UNITED STATE'S CONSTITUTION.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CRIM.R. 29 WHEN THE STATE OF OHIO FAILED TO PRESENT SUFFICIENT EVIDENCE THAT APPELLANT WAS GUILTY OF DOMESTIC VIOLENCE AND ABDUCTION.**

*Assignment of Error No. III*

**THE STATE OF OHIO IMPROPERLY, OVER THE OBJECTION OF COUNSEL, INTRODUCED OPINION TESTIMONY FROM DETECTIVE JASON WINDSOR TO THE PREJUDICE OF APPELLANT AND DEPRIVED HIM OF HIS RIGHT TO A FAIR TRIAL.**

*Assignment of Error No. IV*

**THE STATE OF OHIO IMPROPERLY IMPEACHED ITS OWN WITNESS WITH A PRIOR OUT OF COURT STATEMENT TO THE PREJUDICE OF APPELLANT DEPRIVING HIM OF HIS RIGHT TO A FAIR TRIAL.**

*Assignment of Error No. V*

**THE TRIAL COURT IMPROPERLY PERMITTED A WITNESS TO TESTIFY AS A STRANGULATION EXPERT IN VIOLATION OF EVID. R. 702.**

*Assignment of Error No. VI*

**THE TRIAL COURT IMPROPERLY INTERJECTED ITS OPINION THAT APPELLANT'S COUNSEL WAS NOT HONEST.**

*Assignment of Error No. VII*

**THE TRIAL COURT COMMITTED ERROR WHEN IT GRANTED THE STATE OF OHIO'S MOTION TO JOIN THE TWO SEPARATE CASES TOGETHER, AND IN THE ALTERNATIVE ERRED WHEN IT DENIED THE MOTION TO SEVER THE TWO CASES.**

*Assignment of Error No. VIII*

**APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. IX*

**THE STATE OF OHIO COMMITTED PROSECUTORIAL MISCONDUCT WHEN IT INTRODUCED TESTIMONY RELATING TO APPELLANT'S PRE-ARREST SILENCE.**

*Assignment of Error No. X*

**THE STATE OF OHIO COMMITTED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS BY DENIGRATING OPPOSING COUNSEL AND THE DEFENSE.**

**{¶50}** For ease of discussion we elect to address some of Plott's assignments of error together, and out of the order in which they were raised.

*Assignment of Error No. VII*

**{¶51}** In his seventh assignment of error, Plott argues that the trial court erred in granting the State's "Motion for Consolidation" or, in the alternative, denying his motion to sever. Specifically, Plott argues that (1) joinder was improper under the Rules of Criminal Procedure and that (2) he was prejudiced insofar as the jury got

to consider evidence of his prior domestic violence convictions when considering whether he raped K.D. We disagree.

**{¶52}** Issues of joinder and severance are generally reviewed under an abuse of discretion standard. *State v. Shook*, 3d Dist. Logan No. 8-14-01, 2014-Ohio-3987, ¶ 22; *State v. Bell*, 3d Dist. Seneca No. 13-12-39, 2013-Ohio-1299, ¶ 27. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 2d Dist. Montgomery No. 23037, 2010-Ohio-278, ¶ 18. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

**{¶53}** However, as to the issue of joinder, Plott initially failed to object to the State's "Motion for Consolidation," and therefore, he waived all but plain error. *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 81. To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings that affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Further, plain error only exists where "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436 (1997).

{¶54} Under Crim.R. 13, a trial court may order two or more indictments to be tried together "if the offenses or the defendants could have been joined in a single indictment or information." Two or more offenses may be charged in the same indictment if they are of "the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A).

{¶55} Nonetheless, a defendant may move to sever the indictments joined for trial if it appears that their joinder is prejudicial. Crim.R. 14. To prevail on a motion to sever, a defendant has the burden of demonstrating that

> **(1) his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.**

*State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Id*.

{¶56} A motion to sever is a pre-trial motion and subject to the time limitation contained in Crim.R. 12(D). Crim.R. 12(C)(5). Crim.R. 12(D) provides,

-20-

"All pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier" unless the court extends the time for pretrial motions based on the "interest of justice."

**{¶57}** Courts have affirmed denials of motions to sever where defendants failed to file them in a timely fashion. *See*, *e.g.*, *State v. Bell*, 3d Dist. Seneca No. 13-12-39, 2013-Ohio-1299, ¶ 30 (finding no abuse of discretion where motion to sever was untimely and defendant offered no legitimate reason for its untimeliness); *State v. Montgomery*, 2d Dist. Montgomery No. 22193, 2009–Ohio–1415, ¶ 17 (affirming denial of motion to sever where it was filed outside the time constraints of Crim.R. 12(D)); *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008–Ohio–2041, ¶ 57.

**{¶58}** Here, we cannot say that the trial court abused its discretion in denying Plott's motion to sever. Plott was arraigned on the charges of Domestic Violence and Abduction on June 8, 2015, at which time the trial court also granted the State's "Motion to Consolidate." Plott made no objection to joinder at that time. Rather, Plott filed his motion to sever on September 9, 2015, three months after the indictments were joined and five days before trial and offered no reason as to why his motion was untimely.

**{¶59}** Likewise, we cannot say that the trial court erred in granting the State's "Motion to Consolidate." The State alleged that Plott assaulted Mele and K.D. at

the residence on July 6, 2013. The assaults allegedly occurred within a few hours of each other, and K.D. witnessed Plott's assault on Mele. This could support a conclusion that the offenses were of "the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). Alternatively, the evidence related to each crime was separate and distinct and easily discernible by a jury.

**{¶60}** For these reasons, we find that the trial court did not err in granting the State's "Motion to Consolidate" and denying Plott's motion to sever.[3] Accordingly, we overrule Plott's seventh assignment of error.

*Assignment of Error No. II*

**{¶61}** In his second assignment of error, Plott argues that the trial court erred in denying his motions for acquittal on the Domestic Violence and Abduction charges. Specifically, Plott argues that the State failed to prove that Mele was a "family or household member" within the meaning of R.C. 2919.25 and that the State failed to prove that Mele was "placed in fear" within the meaning of R.C. 2905.02.[4] We disagree.

---

[3] This is true regardless of what standard of review we apply. To the extent that Plott filing a late motion to sever constitutes an "objection" to the much earlier joinder, which we would review under a harmless error/abuse of discretion standard, we cannot find that there was error here.

[4] Plott does not challenge the trial court's denial of his motions for acquittal on the charge of Rape or any other element of the Domestic Violence and Abduction charges.

**{¶62}** When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

*R.C. 2919.25 – Domestic Violence*

**{¶63}** R.C. 2919.25(A) provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." "Family or household member" means any of the following:

> (a) **Any of the following who is residing or has resided with the offender:**
>
> (i) **A spouse, a person living as a spouse, or a former spouse of the offender;**
>
> * * *

R.C. 2919.25(F)(1). "Person living as a spouse" means "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is

cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

**{¶64}** Here, Plott argues that the State did not present sufficient evidence that he and Mele "cohabitated." Specifically, Plott argues that the evidence shows that he "was the one that maintained his home, paid the bills for his home, and that he was the sole owner of it." Appellant's Brief, p. 14.

**{¶65}** However, in *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, ¶¶ 17-18, the Ohio Supreme Court found that the State is not required to present evidence of shared financial or familial responsibilities and consortium in order to establish "cohabitation" if the victim testifies that she and the defendant were living together at the time of the incident. The Court noted that this kind of evidence is only required "when the victim and the defendant do *not* share the same residence." (Emphasis sic.) *Id*. at ¶ 13.

**{¶66}** During the State's case-in-chief, Mele testified that she and Plott were engaged and lived together at the residence at the time of the alleged assault. Other witnesses also testified that Mele lived at the residence. Pursuant to *McGlothan*, this is sufficient to show that Mele was a "person living as a spouse" within the meaning of R.C. 2919.25(F)(2) and therefore, a "family or household member" within the meaning of 2919.25(F)(1).

*R.C. 2905.02 - Abduction*

**{¶67}** R.C. 2905.02(A)(1) provides, "No person, without privilege to do so, shall knowingly do any of the following:  By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear."

**{¶68}** Here, Plott argues that in order to convict him of Abduction, the State had to prove that he "knowingly, by force or threat of force, restrained [Mele's] liberty under circumstances that placed her in fear."  Appellant's Brief, p. 14.  Plott claims that "if [Mele] was never put in fear by [his] actions, [he] would not be guilty of abduction."  *Id*.

**{¶69}** However, the statute does not require that the victim be placed in fear in order for a defendant to be convicted of abduction; a defendant may be convicted of abduction if the defendant, by force or threat, restrains the victim's liberty under circumstances that create a risk of physical harm to the victim.

**{¶70}** During the State's case-in-chief, K.D. testified that she observed Plott choke Mele and kick her repeatedly, knocking her to the floor.  She added that Mele tried to get up off the floor, but Plott kept kicking her.  This testimony is sufficient to establish that Plott forcibly restrained Mele's liberty under circumstances that created a risk of physical harm to her.

{¶71} For these reasons, we find that the trial court did not err in denying Plott's motions for acquittal. Accordingly, Plott's second assignment of error is overruled.

*Assignment of Error No. VIII*

{¶72} In Plott's eighth assignment of error, he argues that his convictions for Rape, Domestic Violence, and Abduction were against the manifest weight of the evidence. We disagree.

{¶73} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins, supra,* at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

*Domestic Violence and Abduction*

**{¶74}** In arguing that his convictions for Domestic Violence and Abduction were against the manifest weight of the evidence, Plott contends that the actual victim of these crimes, Mele, was unable to provide any testimony that Plott actually struck her or choked her. He also argues that Lieutenant Windsor's testimony lacked specificity because the injuries to Mele's neck were not measured and compared to Plott's hands, and Plott argues that he emphatically denied the allegations in his testimony. Finally, Plott argues that even if the evidence was sufficient to support the conclusion that Mele was a family or household member to an extent that would satisfy R.C. 2919.25, the determination that Mele was a family or household member was against the weight of the evidence.

**{¶75}** Contrary to Plott's arguments, we cannot find that his convictions for Domestic Violence and Abduction were against the manifest weight of the evidence. Although Plott disputed that Mele was his fiancé, Mele testified that she was his fiancé and it was not disputed that they lived together. This evidence certainly supports the finding that Mele was a family or household member and we cannot find that such a determination is against the weight of the evidence.

{¶76} As to the incident in question, K.D. specifically testified that she personally witnessed Plott choking and striking Mele. In addition, the State presented the testimony of a strangulation expert, who testified to a reasonable degree of scientific certainty that the marks on Mele's neck were consistent with strangulation. Photographs of the marks on Mele's neck were introduced into evidence for the jury to observe and evaluate. State's Exs. 6, 7.

{¶77} K.D.'s version of events was corroborated, in part, by a friend of Mele's, Jody Noon, who testified that she was with Mele and Plott at the Eagles on July 6, 2013. Noon testified that Plott was told to leave the bar because he was getting loud. Noon testified that before Mele went back to her residence with Plott that evening Noon did not observe any marks on Mele's neck. Noon testified that Mele then called her later in the evening, "crying and upset," stating that Mele needed a ride from Plott's residence because Plott had "hurt her," and that it was "urgen[t]." Trial Tr., p. 241. When Noon picked up Mele, she noticed the marks on Mele's neck that she had not seen earlier that night. All of this evidence is consistent with K.D.'s testimony that Plott was violent with Mele at Plott's residence that evening.

{¶78} Notably, Mele's testimony never contradicted K.D.'s eyewitness testimony related to the Abduction and Domestic Violence charges. Mele testified numerous times that she did not remember how she got the marks on her neck, *and*

that it was possible that Plott caused the injuries, she just claims she could not recall. The jury was free to find Mele's testimony not to be credible, particularly given Noon's testimony that the injuries to Mele were not present earlier in the night.

{¶79} Finally, as the testimony relates to these charges, the jury in this case was able to see and hear the testimony of Plott himself, who testified that he did not commit any of the acts he was charged with. The jury was able to evaluate his credibility and the credibility of all witnesses involved and add those determinations to the substantial evidence presented.[5] Based on the evidence presented, we cannot find that Plott's convictions for Domestic Violence and Abduction were against the manifest weight of the evidence.

*Rape*

{¶80} Rape, as it was charged in this case, is codified in R.C. 2907.02(A)(2), and reads, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶81} Plott challenges his conviction for Rape on appeal by contending that K.D.'s testimony was simply not credible, particularly in comparison to Plott's story that he had engaged in consensual sex with K.D.

{¶82} Contrary to Plott's arguments, the testimony at trial was clear. K.D. specifically testified that Plott raped her, indicating that Plott repeatedly came into

---

[5] We note that Plott stipulated that he had two prior convictions for Domestic Violence, elevating his offense to a third degree felony. Plott makes no arguments related to this on appeal.

her room after Mele had left and attempted to get K.D. to engage in sexual acts with him. K.D. testified that she told Plott "no" and that Plott climbed on top of her anyway and engaged in sexual intercourse.

{¶83} Plott stipulated to the DNA evidence, which established that his semen was found inside K.D. Photographs were taken of a number of bruises that K.D. received and those pictures were entered into evidence. While Plott explicitly denied the allegations, claiming that the sex was consensual, the jury believed that Plott raped K.D. and convicted him of one count of rape.[6]

{¶84} Based on the evidence presented we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice in convicting Plott of one count of Rape. Therefore, Plott's eighth assignment of error is overruled.

*Assignment of Error No. I*

{¶85} In his first assignment of error, Plott argues that the State erred by introducing testimony related to Plott's pre-arrest silence as substantive evidence of guilt. We disagree.

{¶86} The right of an accused to remain silent, enunciated in *Miranda v. Arizona,* 384 U.S. 436 (1966), carries with it an implicit assurance that his silence will not be used against him. *Doyle v. Ohio,* 426 U.S. 610, 618 (1976). "A

---

[6] K.D. did claim that Plott raped her twice that evening and the jury only convicted Plott of one count of rape, likely because in K.D.'s account of the events to the SANE, the SANE only wrote down one incident of vaginal penetration.

-30-

defendant's decision to exercise his right to remain silent * * * is generally inadmissible at trial either for purposes of impeachment or as substantive evidence of guilt." *State v. Perez,* 3d Dist. No. 4–03–49, 2004–Ohio–4007, ¶ 10, citing *State v. Leach,* 102 Ohio St.3d 135, 2004–Ohio–2147. Use of a defendant's silence in the State's case-in-chief puts a defendant in the position of having to choose between allowing a jury to infer guilt from his silence or being forced to take the stand to explain his prior silence, thereby surrendering his right not to testify. *Perez,* 2004–Ohio–4007, at ¶ 20. However, the introduction of evidence regarding a defendant's decision to remain silent does not constitute reversible error if, based on the whole record, the evidence was harmless beyond any reasonable doubt. *State v. Zimmerman,* 18 Ohio St.3d 43, 45 (1985). The Ohio Supreme Court has held that "[a] single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." *State v. Treesh,* 90 Ohio St.3d 460, 480, 2001–Ohio–4; *see also State v. Roby,* 3d Dist. Putnam No. 12–09–09, 2010–Ohio–1498, ¶ 14.

**{¶87}** In this case, Plott specifically takes issue with the following examination of Lieutenant Windsor.

> **Q [Prosecutor]: Did you have a chance to speak with the Defendant, Raymond Plott, about this case?**
>
> **A [Windsor]: I spoke with him over the phone on Monday, I believe, July 8th.**

**Q: And what did he tell you?**

**A: He said he was coming to turn himself in and that he wasn't going to talk to me without his attorney.**

Trial Tr., p. 158. Plott's counsel objected to this questioning, and that objection was overruled.

{¶88} There was no further mention by Lieutenant Windsor of Plott's silence. Similarly, there was no further mention by the State.[7]

{¶89} Plott argues that the brief, preceding segment was improper and significant enough to warrant reversal of this entire trial. In support, he cites this Court's decision in *State v. Perez*, 3d Dist. Defiance No. 4-03-49, 2004-Ohio-4007. In *Perez*, this Court reversed a conviction where evidence of a defendant's pre-arrest silence was presented by the State and the defendant specifically took the stand to explain why he had not spoken to the police. On its face *Perez* is patently distinguishable from this case where there is no indication that Plott took the stand to refute this single, isolated comment. Thus we do not find *Perez* persuasive here.

{¶90} Moreover, we would emphasize that this was a single, isolated comment without any suggestion that the jury should infer guilt from it, thus making it harmless under *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001–Ohio–4. Therefore,

---

[7] Notably, Plott's counsel actually referenced this exchange in his closing argument, stating that Plott's actions in turning himself in did not seem to be those of a guilty man. "He submitted himself to a DNA standard. Didn't run. Didn't hide. As you heard, I think he, I think the Lieutenant testified, he said he'd come in. Doesn't sound like something a guilty person would do." Trial Tr., p. 569.

we do not find Plott's argument well-taken, and his first assignment of error is overruled.

*Assignment of Error No. III*

**{¶91}** In Plott's third assignment of error, he argues that the State improperly introduced "expert" opinion testimony of Lieutenant Windsor. Plott does not cite any specific instances of improper opinion testimony that he claims are actually prejudicial in this case; rather, he summarily directs us to 18 pages of Lieutenant Windsor's testimony and sweepingly declares that the excerpt contains improper opinion testimony. As Plott fails to direct us to any specific error we could overrule Plott's assignment of error for this reason alone. *See* App.R. 12; App.R. 16.

**{¶92}** Nevertheless, after reviewing the cited pages, we will assume that Plott intends to direct us to Lieutenant Windsor's testimony that "[v]ictims of domestic violence are known to frequently recant their statements to protect their abusers," as it is the only readily apparent piece of testimony that seems to fit with Plott's argument. Trial Tr., at p. 152. Even extracting this testimony to make an argument for Plott, there is no indication that Lieutenant Windsor was offering an expert opinion on this issue and thus we cannot find it was erroneous. Lieutenant Windsor was simply offering an opinion based on his nineteen years of experience as a police officer and his interactions with domestic violence victims as to why he was not surprised that Mele was uncooperative with the investigation.

{¶93} It could perhaps be argued that at this point in the trial there did not yet appear to be any particular basis to address how cooperative Mele had been with the investigation since she had not yet testified, but Lieutenant Windsor was certainly able to give an opinion based on his years of dealing with domestic violence victims, particularly given that he was not offering an ultimate opinion that the domestic violence did or did not happen. Furthermore, Lieutenant Windsor was able to be cross-examined on this testimony, and he was, in fact, cross-examined on this testimony. Trial Tr. p. 173.

{¶94} Finally, Plott directs us to no caselaw establishing how this testimony was erroneous. However, even if Lieutenant Windsor's testimony was erroneous at the time it was entered, we cannot find that it was anything but harmless error in this case. Therefore, Plott's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶95} In Plott's fourth assignment of error, he argues that the State improperly impeached Mele, the State's own witness, with Mele's prior out of court statement. Specifically, he argues that the State improperly impeached Mele with her statements to Lieutenant Windsor in her police interview without showing "surprise" and "affirmative damage." Plott contends that the State was aware Mele's testimony at trial was going to be different from her initial statement to Lieutenant Windsor in the interview, thus the State could not be "surprised," and

any statements Mele made to Lieutenant Windsor in her interview were inadmissible as impeachment evidence.

**{¶96}** "Evid.R. 607(A) authorizes a party to impeach its own witness 'by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.' " *State v. McKelton*, --- Ohio St.3d ---, 2016-Ohio-5735, ¶ 119 (Ohio), *reconsideration denied.* " 'Surprise' occurs when a witness's testimony materially differs from a prior statement and counsel had no reason to believe that the witness would testify as he did at trial." *McKelton* at ¶ 120, citing *State v. Davie*, 80 Ohio St.3d 311, 323, 1997-Ohio-341. "The 'affirmative damage' requirement is satisfied if a 'party's own witness testifies to facts that contradict, deny, or harm that party's trial position.' " *McKelton* at ¶ 121, citing *State v. Blair*, 34 Ohio App.3d 6, 9 (8th Dist.1986). We review a trial court's application of this rule, and on evidentiary rulings in general, under an abuse of discretion standard. *McKelton* at ¶ 119, citing *State v. Davie,* 80 Ohio St.3d 311, 323 (1997).

**{¶97}** In this case, after Mele took the stand, she was asked whether she recalled her interview with Lieutenant Windsor. She indicated that she remembered being present for the interview but she did not recall the conversation itself because she was drunk during the interview. The prosecutor asked if showing her the interview would refresh her recollection of it, and Mele testified that it probably

would not.  At that time the jury was excused and Mele was shown the video of her interview.

**{¶98}** After the interview was played, the jury returned and the following dialogue took place between the prosecutor and Mele.

> **[The Prosecutor]: Having viewed that video, does that refresh your recollection regarding the statements you made to Lieutenant Windsor at that interview?**
>
> **[Mele]: I still don't remember our interview, but seeing that, I can't, you know, I see it on tape.  It's in stone.**
>
> **[The Prosecutor]: Okay.  So are you indicting that, yes, it has refreshed your recollection of the recorded interview you conducted?**
>
> **[Mele]: Kind of parts of it, yes.**
>
> **[The Prosecutor]: Okay.  Having seen that, do you remember Lieutenant Windsor asking you how you got the marks on your neck?**
>
> **[Mele]: I don't remember, I don't remember the interview at all. But you're talking about on there?**
>
> **[Defense Counsel]:  Your Honor, can we approach?**
>
> **[The Prosecutor]: Your Honor -- well, go ahead.**
>
> **The Court: No, wait a second.  Rephrase your question.**
>
> **[The Prosecutor]: Do you remember Lieutenant - - did you see on the video we just watched --**
>
> **[Mele]: I seen [sic.]**

**{¶99} The Prosecutor]: -- did you see Lieutenant Windsor ask you how you - -**

**[Mele]: Yes.**

**[The Prosecutor]: -- got the marks on your neck?**

**[Defense Counsel]: Objection, Your Honor.**

**The Court: Overruled.**

**[The Prosecutor]: Okay.  Just so we're clear, you told Lieutenant Windsor that [Plott] was responsible for the marks on your neck?**

**[Mele]: Yes.**

**[The Prosecutor]: Do you remember also telling Lieutenant Windsor that that was because he was choking you?**

**[Mele]:  Yes.**

**[The Prosecutor]: Do you remember telling Lieutenant Windsor that he hit [K.D.]?**

**[Mele]: I seen [sic], I said that he hit her.  And then I said, I changed it and all I saw was shadows.  I wasn't sure if that mark was from him or the night before.**

**[The Prosecutor]: Do you remember telling Lieutenant Windsor that you saw bruises on her the following morning that were not there yesterday?**

**[Mele]: Yes.**

**[The Prosecutor]: Okay.**

**[Mele]:  No, I wasn't -- I didn't know if they weren't there yesterday because she was wearing - - I couldn't see.  She didn't show me - - she showed me the mark when she showed up to the Eagles and dropped off my tweezers that I had.**

-37-

[The Prosecutor]: But you didn't see the, you don't remember seeing - - you told Lieutenant Windsor you did not see the bruises the previous day?

[Mele]: I didn't see that day. Not that I remember.

[The Prosecutor]: Do you remember talking to Lieutenant Windsor in the video and indicating a conversation you had with [Plott] the following morning?

[Mele]: I asked him if he did it. If he, you know, she's saying he raped her or whatever.

[The Prosecutor]: Do you remember him telling you, I have blackouts. I'm sorry. I didn't mean to hurt you.

[Mele]: Yes.

* * *

[Defense Counsel]: Your Honor, I'm going to continue to object to this line of questioning.

[The Court]: Overruled.

* * *

[The Prosecutor]: [Mele], do you remember sometime after this incident on July 7th, do you remember approaching, approaching [K.D.] and telling her you had a video?

[Mele]: Yes, because I didn't believe her.

[The Prosecutor]: Okay. And what had you hoped to accomplish by telling her that there was a video of what occurred in the, in the home that night?

[Mele]: I would hope that she, you know, would admit that she came on to him.

[The Prosecutor]: Okay. But in reality when you did that, there was no video recording of what happened the night before?

[Mele]: No.

[The Prosecutor]: So in that instance, you were lying in that instance to K.D. about the video?

[Mele]: Yes.

[The Prosecutor]: And you were doing that to help [Plott]?

[Mele]: No. I was doing it for my sanity. For me. Because I didn't believe her.

[The Prosecutor]: Okay.

[Mele]: I would not believe that I was with a man that would do that with someone.

[The Prosecutor]: Right. Nobody wants to believe that?

[Mele]: Right.

[The Prosecutor]: Right?

[Mele]: So it was all me, you know, doing that because I needed to know the truth. Because of the things she was doing before that, staying in my home.

* * *

[The Prosecutor]: So you didn't go - - I just want to make sure we're clear. You're testifying today that you don't remember anything that happened in the, the home that night between you and [Plott] or you and [K.D.]?

[Mele]: I remember some things. Things that were said over and over again.

-39-

[The Prosecutor]: Uh-huh.

[Mele]: Like him questioning her. What did she do good in her life. I remember that. I remember being on the floor because my back was killing me. And I remember her sitting on the couch giggling. And I was furious to like -- because I leave. That's what I do. If somebody gets in my face or bothers me, my thing is to leave. That's what I do. I've done it in past relationships. I don't like fighting. I don't like anybody in my face yelling at me or doing any, you know what I mean, breaking something. Don't like it.

[The Prosecutor]: Is that why you called [Noon], pleading with her to come get you because [Plott] tried to hurt you?

[Mele]: No, I wanted to leave. I didn't say -- I don't know what I said to her. I just wanted a ride out of there. I kept telling [K.D.], please, let's go. Let's go. Let's go. I don't know how many times I could ask her to go. So I couldn't get in the car because I was intoxicated, so I'm not going to get in the car and drive. But I had no choice but to get [Noon] to come get me.

\* \* \*

[The Prosecutor]: All right. Now, I want to make sure we're clear on your testimony today, [Mele].

[Mele]: Uh-huh.

[The Prosecutor]: We asked you about the marks on your neck. And you're testifying today that although you told Lieutenant Windsor that those were a result of choking, [Plott] choking you, today your testimony is that you don't remember how you go those marks on your neck?

[Mele]: I don't remember. I know I had marks. I know I fell, so I can't say 100 percent he didn't do it. I just know and then seeing that, if I said that, then that's what must have happened because -- but I don't remember. I can't say yes and I can't say no - -

-40-

**[The Prosecutor]: Okay.**

**[Mele]: -- if I don't remember.**

**[The Prosecutor]: Okay. But you're acknowledging that if you said that to Lieutenant Windsor the very next afternoon, the very next day, you're acknowledging that that's what must have happened?**

**[Mele]: That's what I'm -- yes. That's what I'm thinking.**

**[The Prosecutor]: Talking about the choking and the marks on your neck?**

**[Mele]: Right.**

**[The Prosecutor]: Okay. You mentioned being on the ground and your back being in pain. Are you testifying that you don't remember how you got on the ground or how your back was in pain?**

**[Mele]: I was walking in the door and there's a little like lip on it. I'm not sure, I must have, foot kicked it and hit the door jamb because I think he was trying to probably get in behind me and he wanted the keys. And I remember just throwing them towards [K.D.] Because I probably didn't want him to have it because he would get in the car and probably go. Which maybe I should have let him, but --**

*Id*. at p. 410-417.

{¶100} An additional relevant dialogue was held on re-direct.

**[The Prosecutor]: [Mele], you said [Plott], he did not make you beg to live?**

**[Mele]: No. I don't remember that.**

[The Prosecutor]: In fact, it was him making [K.D.], he was asking her a bunch of questions?

[Mele]: I remember it was all towards her.

[The Prosecutor]: Okay. Those kinds of questions why - -

[Mele]: Yeah. All those kinds of questions.

[The Prosecutor]: Okay. About why she should live?

[Mele]: The only thing I remember is him saying what did you do good in your life. That's all I remember because it was, over and over and over and over and over again.

[The Prosecutor]: And when he was saying that to her, was he talking like you and I are? Was he raising his voice? Was he whispering?

[Mele]: I don't remember exactly his tone at that point. I remember the question, it was like a question, it was just like a normal question being asked, so I don't think it was kind of like a violent way.

[The Prosecutor]: You testified that, again, you needed to leave. You felt that on that night you needed to get out of that home?

[Mele]: Uh-huh.

[The Prosecutor]: And is it fair to say that the reason you needed to get out of [the residence] is because of the violence?

[Mele]: Because of the way he acts. The way he was acting. To me that's ridiculous. You know what I mean? I don't deal with that. I'm going to go and I'm going to let him sleep it off, relax, whatever. And I'm going to go out and get out of there. That's all. It's like basically punishment to him. I, I leave.

-42-

[The Prosecutor]: So you didn't leave the house - - are you testifying that you did not leave the house because you were strangled earlier in the evening?

[Mele]: No.  Because I have left the house before when he yells at me.

[The Prosecutor]: Okay.  So are you saying now that you were not strangled?

[Mele]: Oh, I don't know.  I don't remember being strangled, but I'm saying from what I see in the video and from what I said, I believe I was if I said it.

[The Prosecutor]: Okay.

[Mele]: Like I said, I can't tell you 100 percent.  I'm not, you know what I mean?  I can't remember.

[The Prosecutor]: Right.  But on the conversation with you, the conversation you had with Lieutenant Windsor, you were - - you saw that interview and now you remember that interview.  You weren't indicating to Lieutenant Windsor you were having issues remembering anything?

[Mele]: What do you mean?  I don't remember - - I seen [sic] the video.  I'm seeing what I see.  What I said.

[The Prosecutor]: Right.

[Mele]: So I'm taking a chance of believing what I see and what I said.

[The Prosecutor]: And - -

[Mele]: I can't - - oh, I'm sorry.

[The Prosecutor]: No, go ahead.

**[Mele]: * * * If I said he choked me, then it probably happened. So I can't guarantee you. Because then I would be lying saying yes, he did do it when I don't know if he did it. I can't say he did it. I can't say he didn't. But my testimony there shows because it seems like that's what I said. And I did have the marks on my neck.**

**[The Prosecutor]: And on that July 7th interview, you weren't making any qualifying statements to Lieutenant Windsor about it may have happened or I may not remember. You were telling him on that date definitively what happened?**

**[Mele] Yeah. I seen [sic] that.**

*Id*. at p. 429-432.

{¶101} Plott argues on appeal that the preceding testimony constitutes the State introducing improper impeachment evidence of its own witness as the State was aware that Mele would not be testifying that she remembered Plott harming her like she had stated in her interview with Lieutenant Windsor. Plott argues that the State could not show "surprise," and therefore could not impeach its own witness with prior inconsistent statements from the interview.

{¶102} At the outset, we note that the preceding questioning and testimony indicates that while Mele initially claimed that she did not remember her interview or the pivotal details of the night in question, she also, on numerous occasions, and with regard to other specific statements and incidents, testified that her memory had in fact been refreshed or at least that after viewing the video she did in fact remember and acknowledge the reality of significant parts of the incident, to which she gave

testimony. This indicates that some of the testimony provided by Mele was from her own memory and did not contain impeachment by prior inconsistent statements at all.

{¶103} Nevertheless, the State is permitted to lay a necessary foundation for introducing a prior statement in order to attempt to demonstrate surprise and affirmative damage. "In order to introduce a witness's prior inconsistent statement a proper foundation must be laid, which is accomplished when a witness denies making the prior statement." *State v. Wilbon*, 8th Dist. Cuyahoga No. 82934, 2004-Ohio-1784, ¶ 26, citing *State v. Soke*, 105 Ohio App.3d 226 (8th Dist.1995), citing *State v. Riggins*, 35 Ohio App.3d 1 (8th Dist. 1986). "Further, when a witness claims a lack of memory regarding the events described in a prior statement, the prior statement is considered inconsistent and is therefore admissible." *Id*, citing *State v. Portis,* 10th Dist. Franklin No. 01AP-1458, 2002-Ohio-4501.

{¶104} Here, the State would certainly be permitted to ask a number of foundational questions as to what Mele remembered, if she remembered talking to the police, and if she remembered the incident, and then attempt to refresh her recollection related to those things. The State could then question her once that attempt had been made to see if she then remembered the incident or making any statements before ever using any specific statements themselves.

{¶105} However, in this case, once the State had asked its foundational questions, to the extent that Mele claimed that she "did not remember" there may have been some impeachment or hearsay questions that were improperly asked by the State without establishing the requisite showing of surprise. Nevertheless, Mele's testimony is, at best, merely equivocal as to what she did and did not remember both before and after attempting to refresh her recollection.[8]

{¶106} Moreover, even if we were to assume that this entire line of questioning was improper either as improper impeachment of the State's own witness or improper hearsay, we cannot find that it was anything but harmless in this case. Mele was not present for the rape of K.D. and she provided no testimony related to the elements of that offense. Thus there could be no impact *at all* of this testimony on the Rape conviction.

{¶107} As to the Domestic Violence and Abduction charges related to Mele, the primary testimony regarding those charges was provided by K.D., who witnessed them. K.D.'s testimony was then corroborated in part by Noon and the strangulation expert. The jury was able to see photos of the injuries on Mele's neck and weigh Plott's credibility as to his denials. At best Mele was only able to say that she did not remember what happened and it was possible Plott caused the injuries but she also claimed it was possible the injuries were from a fall the night

---

[8] It should be noted that Mele's interview with Lieutenant Windsor was never shown to the jury, Mele was simply asked about some statements she made therein.

prior. Thus we cannot find that the testimony was anything but harmless error. This is not a situation where absent the victim's testimony there was no other evidence to convict Plott. There was a witness to the act present whose testimony was corroborated in part by multiple sources. Therefore Plott's fourth assignment of error is overruled.

*Assignment of Error No. V*

{¶108} In Plott's fifth assignment of error, he argues that the trial court improperly permitted Ruth Downing to testify as a strangulation expert in contravention of Evid.R. 702. Specifically, he contends that Downing's testimony was unreliable as it related to strangulation because, (1) strangulation was a "relatively new area;" (2) Downing's "methodology" had not been peer-reviewed; (3) there was no known error rate; and (4) there was no indication that Downing's "methodology" had gained general acceptance. Appt.'s Br. at p. 19.

{¶109} Evidence Rule 702 governs the admissibility of expert testimony. It reads,

**A witness may testify as an expert if all of the following apply:**

**(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;**

**(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;**

**(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:**

**(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;**

**(2) The design of the procedure, test, or experiment reliably implements the theory;**

**(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.**

{¶110} In determining whether the opinion of an expert witness is reliable under Evid.R. 702(C), a trial court, acting as a gatekeeper, examines whether the expert's conclusion is based on scientifically valid principles and methods. *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006–Ohio–3561, ¶ 16, citing *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607 (1998). "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subject to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller* at 611, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–94, 113 St. Ct. 2786 (1993).

{¶111} Although these factors may aid in determining reliability, none of the factors are dispositive as the inquiry is flexible. *Id.,* citing *Daubert* at 594.

Ultimately, the focus is "solely on principles and methodology, not on the conclusions that they generate." *Daubert* at 595. However, "[w]hen performing [the preceding] analysis, we are mindful that 'courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met.' " *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 76, quoting *State v. Nemeth,* 82 Ohio St.3d 202, 207 (1998).

**{¶112}** In this case, Ruth Downing testified that she was a family nurse practitioner and a forensic nurse. She testified that she had been a registered nurse for 39 years, that she had received a "Bachelor of Science and Nursing" from Otterbein University, that she received a Master of Science in Nursing in 2006 and had received a post-master certificate as a family nurse practitioner. She testified that she was also trained as a Sexual Assault Nurse Examiner and was a member of a number of professional organizations. She also testified that she founded an educational consultation business called Forensic Healthcare Consulting.

**{¶113}** Downing then provided her training specifically related to domestic violence and strangulation, which included over 50 "trainings" on those issues. Downing testified that she taught a number of classes on the issues. She testified that she had reviewed approximately 40 to 50 cases on strangulation and thousands of victims of violence. She testified that she had provided testimony on the issue of strangulation five times in a number of courts all over the United States.

**{¶114}** The State then moved to have Downing declared an expert in the effects and identification of strangulation. At that time, the court allowed defense counsel to conduct *voir dire* of Downing. Defense counsel asked whether she had ever been peer reviewed for articles and publications, and she stated that she had. She testified as to how she would identify if someone had been strangled, and she testified that she had a standardized methodology that was based on standard practices in the industry. She testified that some of her methods were subjective but "a lot of it is based on the current research that we have from a variety of disciplines." Trial Tr., p. 441.

**{¶115}** After defense counsel's *voir dire*, Downing was classified as an expert in the effects and identification of strangulation without any objection by defense counsel.

**{¶116}** On appeal, it does not appear that Plott takes issue with anything related to Evid.R. 702(A) or (B).[9] Plott appears to focus his argument on Evid.R. 702(C), claiming that there was not enough indicia of reliability associated with Downing's testimony related to identifying strangulation.

**{¶117}** Contrary to Plott's arguments, Downing clearly testified that her work was accepted, that she had a standardized methodology and that she discussed

---

[9] Nevertheless, even if he had challenged these issues we could not find that the trial court erred in determining that Downing was qualified to provide expert testimony and that her testimony related to matters beyond the knowledge or experience possessed by lay persons.

issues with her peers. She testified that she did not know that there was anything set up right now for [peer review] of strangulation in particular. It's a relatively new area of inquiry in the health care profession." Trial Tr., at p. 441. There was no indication that a specific "experiment" was done in this case and Downing clearly testified as to what she considered and how she reached her conclusion to a reasonable degree of scientific certainty that Mele had been strangled. That conclusion was fully subject to cross-examination. Based on the evidence presented we cannot find that the trial court erred in permitting Downing's testimony as an expert witness. Therefore, Plott's fifth assignment of error is overruled.

*Assignment of Error No. VI*

{¶118} In Plott's sixth assignment of error he argues that the trial court improperly interjected its opinion that defense counsel was dishonest. We disagree.

{¶119} While the rape victim, K.D., was being cross-examined in this case, Plott's counsel asked her why she did not leave the residence and why she did not lock Plott out of her room. K.D. testified that there was no lock on her bedroom door. The following exchange then occurred.

> **Q [Defense Counsel]: If other people have testified that there's a lock on that door, if Lieutenant Windsor testified to that, would that be a mistake?**
>
> **[Prosecutor]: Objection. I don't know that Lieutenant Windsor testified to that.**

> **THE COURT: Sustained. [Defense Counsel], you are making things up, perhaps. I'm going to go off the record and meet counsel in chambers.**
>
> **(The Court and Counsel had a conference in chambers and reviewed prior testimony.)**
>
> **THE COURT: Ladies and gentlemen, I apologize for the delays. This Court does allow Counsel to take testimony, either Counsel, and change it in forming questions. So we wanted to be sure what was said so that the questions are proper. And in this case, I wanted to be sure what was said about doors locked and unlocked. All right. And whether there are locks or not locks on them, I don't mean to imply that Counsel is doing anything wrong, either Counsel. I just want to be sure that when a question is asked of a witness, any witness, that there is some foundation for that question.**
>
> **So we have taken care of that and, [Defense Counsel], you may proceed.**

Trial Tr., p. 332-333.

{¶120} Plott argues on appeal that the preceding interjection by the trial court that Plott's counsel was "making things up, perhaps," showed that the court was biased against Plott and his attorney. To support his claim, Plott cites *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, for the proposition that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process. *Dean* at ¶ 48. In *Dean*, "the trial court made accusatory and threatening comments toward counsel during trial and denied counsel reasonable opportunities to consult with the defendant." *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 81, citing *Dean* at ¶¶ 51, 53. The trial court also suggested that counsel had manipulated,

defrauded and deceived the court in attempting to disqualify the judge from sitting on the trial. The Supreme Court of Ohio determined that the judge had "deep-seated bias against counsel" throughout the entire trial, which actually led to the defendant seeking to represent himself in the proceedings. *Dean* at ¶ 66.

{¶121} First, the circumstances present in *Dean* are readily distinguishable from this case. Here, there was a single isolated comment and the comment in no way led to Plott seeking to represent himself. Thus *Dean* is hardly relevant and certainly does not compel a different result here. Second, the trial court's statement that defense counsel was "perhaps" making up facts was technically correct. A review of Lieutenant Windsor's testimony shows that Lieutenant Windsor never did testify that K.D.'s room had a lock on it; rather, Lieutenant Windsor testified that he could not "recall if they do or not." Trial Tr., p. 172.

{¶122} Third, as soon as the proceedings reconvened after the parties and the trial court reviewed the prior testimony, the trial court explicitly stated to the jury that it did not mean to imply that defense counsel was doing anything wrong, alleviating any appearance of bias. Fourth, and finally, the trial court later instructed the jury that if it "said or did anything which you consider an indication of my view on the facts, you are instructed to disregard it. The Judge must be, and sincerely desires to be, impartial in presiding over this and every other trial[.] * * * The Court does not have the right, does not desire to invade the province of the jury by

indicating in any way a preference between the State of Ohio and the Defendant." Trial Tr., p. 595-596. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168.

{¶123} Given that what the trial court said was technically correct, and given that corrective measures were taken, we cannot find any error here. Therefore, Plott's sixth assignment of error is overruled.

*Assignments of Error Nos. IX and X*

{¶124} In his ninth and tenth assignments of error, Plott argues that the State committed prosecutorial misconduct. In his ninth assignment of error he argues that the prosecutor committed misconduct "when it introduced testimony relating to [Plott's] pre-arrest silence," which was discussed in the first assignment of error. Appt.'s Br., p. 14. In his tenth assignment of error, Plott argues that the State committed prosecutorial misconduct during closing arguments.

{¶125} "In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant." *State v. Stober,* 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, ¶ 131, *appeal not allowed*, 140 Ohio St.3d 1438, 2014-Ohio-4160, and *appeal not allowed*, 146 Ohio St.3d 1472, 2016-Ohio-5108, citing *State v. Jones*, 90 Ohio St.3d 403, 420 (2000). "In making this

determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Underwood*, 73 Ohio App.3d 834, 840-841 (4th Dist.1991), quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982).

**{¶126}** Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca Nos. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986).

**{¶127}** Furthermore, as to prosecutorial misconduct allegations related to closing arguments, "[p]arties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be

drawn from the evidence.' " *State v. Wolff*, 7th Dist. Mahoning No. 07MA166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 213. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 116.

**{¶128}** In this case, Plott first contends that the prosecutor committed misconduct by introducing testimony related to Plott's pre-arrest silence. Plott makes essentially the same argument that he made in the first assignment of error as support for his contention. As we found no prejudicial error in the first assignment of error in introducing the brief, isolated statement by Plott that he was turning himself in but would not speak to authorities without an attorney, we similarly can find no prosecutorial misconduct rising to a prejudicial level here. Therefore, Plott's ninth assignment of error is overruled.

**{¶129}** Next, Plott contends that there were five references in closing arguments wherein the prosecutor committed misconduct by "denigrat[ing]" defense counsel. All five references were in the State's rebuttal closing arguments. They read as follows.

> [1][10] **So Defense Counsel is trying to make you speculate about things. Well, he must not be guilty because we have a DNA sample.**

---

[10] The numbers were not in the transcript, they are inserted for ease of reference.

Trial Tr., p. 584.

> [2] **Now, Defense Counsel, as we know, he's not purporting to be a strangulation expert, is he? We only heard in this case from one strangulation expert. Now, the strangulation expert did look at these photos and say, oh, well, there's not a clear, this doesn't look exactly like a clear hand print. Ladies and gentlemen, nobody expects a full hand print to be on there. She didn't dismiss these. So when Defense Counsel asks you to do that, not being a strangulation expert, I ask you to disregard that…rely on the testimony of the expert. Not Defense Counsel's expectations of what a, a strangulation victim should look like.**

*Id.* at 584-85.

> [3] **Also, Defense Counsel said [K.D.] had reluctance answering questions. Now, you were all here. Did it appear that she was reluctant answering questions because she says uh-huh instead of yes? Everybody knows what that means. Everybody in this courtroom knows that's an affirmative answer. It's only Defense Counsel, excuse me. For the record. I'm sorry. He knows it's difficult to sit here and talk about that kind of thing. You saw the emotion in her voice. So he's trying to get under her skin. So we are going to disregard what she said because she didn't verbalize yes instead of uh-huh? Does that mean she's reluctant to answer questions, ladies and gentlemen? That's Defense Counsel trying to create an issue that doesn't exist.**

*Id.* at 585-86.

> [4] **But at the end of the day, what Defense Counsel is attempting to suggest to you all is that because she didn't hop out a window or because she grabbed a pair of tweezers, that means that this whole thing didn't happen. Ladies and gentlemen, there's not a rule book * * * that sexual assault victims are required to follow.**

*Id.* at 591.

> [5] **All sexual assault victims react differently.  \* \* \* So I'd ask you not to discard her testimony because she didn't follow the arbitrary set of rules Defense Counsel has placed on her.**

*Id.*

**{¶130}** After reviewing the closing arguments as a whole, and more specifically the cited portions by Plott on appeal, we can find no error here, let alone error that would rise to the level of prosecutorial misconduct.  All of the prosecutor's statements were made in rebuttal closing argument in response to arguments made by defense counsel in his closing arguments.  Numbers 1 and 2 were in response to defense counsel stating that bruising on Mele's neck in one of the pictures did "not look like somebody's hand."  *Id*. at 578.  Number three above was in reference to defense counsel's statement that K.D. "had reluctance answering questions."  *Id*.  Numbers four and five above were statements made after defense counsel suggested that K.D. was not acting as someone who had been sexually assaulted might because she did not "run out the door[.]"  *Id*. at 577.

**{¶131}** Thus all of the preceding statements were directly in response to arguments made by defense counsel, which is permissible in closing arguments.  There is nothing in the preceding statements that "denigrates" defense counsel; rather, the prosecutor suggests that the arguments and conclusions that defense counsel made in closing argument were not supported by the evidence presented.

We can find no error here, let alone prejudicial error. Therefore, Plott's tenth assignment of error is overruled.

{¶132} For the foregoing reasons Plott's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth assignments of error are overruled and the judgments of the Seneca County Common Pleas Court are affirmed.

*Judgments Affirmed*

**WILLAMOWSKI, J., concurs.**

**/jlr**

**ROGERS, J., dissents.**

{¶133} I must respectfully dissent from the majority's conclusions in Assignment of Error No. IV.

{¶134} Plott takes issue with the Prosecutor asking Mele questions about what she told Lieutenant Windsor during her interview. While Plott claims that the State improperly impeached its own witness under Evid.R. 607(A), a quick review of the record reveals that the Prosecutor was not asking these questions to impeach Mele's credibility but to elicit substantive evidence of Plott's guilt. Either way, however, Mele's testimony was improper.

{¶135} Early into trial, the issue of Mele testifying was discussed:

[Defense Counsel]: The second item, Your Honor, it sounds as though from the Prosecution's opening statement, it sounds as if the

Prosecution is on notice that their alleged victim, [Mele], will come in here and either deny that the events transpired or that she just simply doesn't remember. Since they're going to be calling this witness on direct, I would move the Court for an instruction of 607, Impeachment, 607(A) that no party may impeach their own witness either through testimony of other witnesses or through documentation or audio or recording unless they can show surprise and prejudice. And here, I don't think there's any mistake that there will be no surprise that she's going to testify contrary to the facts contained in the indictment.

The Court: Mr. Boos?

[The Prosecutor]: No, Your Honor. We're certainly not surprised in this case. She testified at a prior hearing as to that fact. But we've not indicated that we intend to call her as a witness. I believe defense counsel indicated he may utilize her. We may ask the Court, we may at a later time, depending on how the trial goes, utilize 614(A) but that's not something where we're at at this time. * * * .

The Court: Let's take it up at the appropriate time, which you're not planning at this time to call?

[The Prosecutor]: That State will not be calling [Mele] as a witness.

Trial Tr., p. 142-143.

{¶136} The State changed its mind, however, after the trial court declined to call her as a witness and indicated that her testimony was necessary to avoid Confrontation Clause issues.

{¶137} When Mele took the stand, the Prosecutor began by asking her about her interview with Lieutenant Windsor. Mele denied any recollection of the interview. The Prosecutor asked her if showing her the interview would refresh her recollection. Mele indicated that it may, and the Prosecutor showed her the

interview outside the presence of the jury. Afterwards, the jury returned, and the Prosecutor asked Mele whether her recollection had been refreshed. Mele replied, "I still don't remember our interview, but seeing that, I can't, you know, I see it on tape. It's in stone." Trial Tr., p. 410. Over Plott's objection, the Prosecutor continued asking Mele about what she told Lieutenant Windsor during her interview. Mele answered the Prosecutor's questions but indicated that her testimony was based on what she had just heard herself say in the video.

{¶138} Evid.R. 612 permits a party to use a writing to refresh a witness's recollection. "Before using a recording to refresh a witness's recollection, it must first be established that the witness cannot currently recall the events or information recorded." *State v. Fair*, 2nd Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 59, citing *State v. Gunn*, 2nd Dist. Montgomery No. 16617, 1998 WL 453845 (Aug. 7, 1998). "When a videotape exists of the statements, the correct procedure is to allow the witness to view the recording outside the presence of the jury, thereby having his recollection refreshed; the witness may then testify based upon his or her own present knowledge." *Id.* If the recording does not refresh the witness's recollection, then the further inquiry as to matters discussed in the recorded statement is prohibited. *See* Evid.R. 602 (A witness may not testify to a matter unless the witness has personal knowledge of it). The recording "used to refresh the witness's recollection is not admitted into evidence unless admission is requested by the

adverse party, and in any event has no substantive evidentiary significance." *City of Dayton v. Combs*, 94 Ohio App.3d 291, 298 (2d Dist.1993).

{¶139} Mele's recollection of her interview with Lieutenant Windsor was not refreshed after viewing the video. Afterwards, Mele indicated that she still "did not remember the interview at all." Trial Tr., p. 410. Throughout the course of her testimony, Mele indicated *numerous* times that she was basing her testimony on what she had just heard herself say in the video—not what she independently recalled. This kind of testimony is improper under Evid.R. 612 and 602.

{¶140} Further, even if, arguendo, Mele's recollection of her interview with Lieutenant Windsor had been refreshed, she was testifying to what she told Lieutenant Windsor in her interview (i.e., out of court statements), and the State was offering her statements to prove that Plott assaulted her on the evening of July 6, 2013 (i.e, the truth of the matter asserted). Indeed, the Prosecutor asked Mele, "But you're acknowledging that if you said [that the marks on your neck were a result of Plott choking you] to Lieutenant Windsor the very next afternoon, the very next day, you're acknowledging that that's what must have happened?" *Id*. at p. 416-417. Mele's testimony is textbook hearsay and inadmissible under the Rules of Evidence. Evid.R. 801(C) (Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted); Evid.R. 802 (Hearsay is inadmissible, unless it falls within an exception).

{¶141} The majority glosses over these important evidentiary issues and quickly concludes that any perceived error was harmless. "Under Evid.R. 103(A) and Crim.R. 52(A), we disregard as harmless the admission of improper hearsay evidence unless a substantial right of the party is affected." *State v. Missler,* 3d Dist. Hardin No. 6–14–06, 2015–Ohio–1076, ¶ 60, citing *State v. Richcreek,* 196 Ohio App.3d 505, 2011–Ohio–4686, ¶ 31 (6th Dist.). Substantial rights are not affected "where the remaining evidence constitutes overwhelming proof of a defendant's guilt * * *." *State v. Jones,* 3d Dist. Van Wert No. 15–11–16, 2012–Ohio–5334, ¶ 34, citing *State v. Murphy,* 91 Ohio St.3d 516, 555 (2001); *see also State v. Brown,* 65 Ohio St.3d 483, 485 (1992) (harmless error exists if there is no reasonable probability that the error affected the trial's outcome).

{¶142} Excluding Mele's inadmissible testimony, the evidence supporting Plott's domestic violence and abduction convictions consisted primarily of K.D.'s testimony that she saw Plott push, choke, and kick Mele inside the residence. Noon testified that she picked Mele up from the residence that night after Mele called her and said that Plott had hurt her. She testified that she observed marks on Mele's neck that she had not seen earlier that day, and Downing later testified that the marks were consistent with a strangulation injury.

{¶143} However, Mele testified that she tripped on the lip of the door when she walked into the residence that night. She stated that Plott did not push her,

choke her, or punch her. As for the marks on her neck, Mele initially stated that she believed she got them from an earlier fall. She later explained, "I know I had marks. I know I fell, so I can't say 100 percent he didn't do it. * * * I can't say yes and I can't say no - - * * * if I don't remember." Trial Tr., p. 416. She stated, however, that she did not leave the residence that night because Plott hurt her. Plott also denied harming Mele.

{¶144} I do not believe the remaining evidence constituted overwhelming proof of Plott's guilt, such that his substantial rights were not affected by Mele's inadmissible testimony. The majority states, "At best Mele was only able to say that she did not remember what happened and it was possible Plott caused the injuries but she also claimed it was possible the injures were from a fall the night prior." Majority Opinion, ¶ 107. But Mele's inadmissible testimony included a detailed account of what Plott allegedly did to her on the night in question and his apparent confession.

{¶145} I also find it troubling that the Prosecutor asked the jury to focus on Mele's inadmissible testimony when considering whether Plott was guilty of domestic violence and abduction. He stated,

> But at the end of the day, ladies and gentlemen, I ask you to focus on the statements that occurred prior to any of these charges being filed against [Plott]. Those statements being, you need to come get me. [Plott] hurt me. And also to Lieutenant Windsor. Remember, she admitted, I told Lieutenant Windsor the day after the offense, yeah, he choked me. Yeah, he caused those marks on my neck. In fact, she

even had to sort of reluctantly acknowledge, well, if that's what I said, what I said happened, then it must have happened. But now that [Plott] is facing a domestic violence conviction, she's decided, well, I don't really remember anything.

*Id*. at p. 550.

{¶146} Further, I do not believe "there could be no impact *at all* of this testimony on the Rape conviction" because "Mele was not present for the rape of K.D. and she provided no testimony related to the elements of that offense." (Emphasis sic.) Majority Opinion, ¶ 106. Whether Plott sexually assaulted K.D. turned on the issue of credibility. K.D. testified that Plott sexually assaulted her twice at the residence and she was too afraid to leave the residence because she had witnessed Plott assault Mele earlier that night. Plott testified, however, that he and K.D. had consensual sex once. Homan's testimony painted another scenario: that K.D. had been sexually assaulted only once. Mele's inadmissible testimony bolstered K.D.'s credibility insofar as Mele essentially repeated K.D.'s version of what happened prior to the alleged sexual assaults; at the same time, it cast serious doubt on Plott's credibility insofar as she testified to his apparent confession.

{¶147} Simply put, the State did not want to call Mele as a witness because it believed that Mele's testimony would cause more harm than good. After the trial court refused to call Mele as a witness, the State had no choice but to put her on the stand or face possible Confrontation Clause issues. When Mele denied recalling

what she told Lieutenant Windsor about that night, the Prosecutor elicited improper testimony under the guise of a refreshed recollection.

{¶148} Accordingly, I would sustain Plott's fourth assignment of error and reverse and remand the matter for a new trial on all three charges.