[Cite as *State v. Glaeser*, 2025-Ohio-2386.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  V.

JENNIFER GLAESER,

    DEFENDANT-APPELLANT.

CASE NO. 3-24-03

OPINION AND
JUDGMENT ENTRY

Appeal from Crawford County Common Pleas Court
Trial Court No. 2022-CR-0363

Judgment Affirmed

Date of Decision:  July 7, 2025

APPEARANCES:

    *Kyle Phillips* and *Nicholas Barons* for Appellant

    *Daniel J. Stanley* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Jennifer Glaeser ("Glaeser") appeals the judgment of the Crawford County Court of Common Pleas, arguing (1) that the trial court erred by consolidating the four criminal cases against her; (2) that her convictions are not supported by sufficient evidence; (3) that her convictions are against the manifest weight of the evidence; (4) that the trial court erred by limiting the scope of cross-examination when the victim testified; and (5) that the trial court erred in permitting the State to call a rebuttal witness. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} In March of 2022, Jeremy Bales ("Bales") began performing work as a handyman at the YMCA in Galion, Ohio where Glaeser was working as a yoga instructor. At this time, Bales was separated from his wife. After several conversations with Glaeser at the YMCA, Bales began exchanging texts with her that included "suggestive" messages. (Tr. 184). However, he stopped communicating with Glaeser around the time that he began a relationship with another woman in April or May of 2022.

{¶3} Bales testified that, in this timeframe, he began to notice Glaeser "circle . . . [his] apartment" and "dr[i]ve by constantly." (Tr. 164). He testified that she "would be holding her phone up taking pictures . . . videos" and that several

videos of him working on a house were posted from an anonymous Tik Tok account. (Tr. 165). Bales stated that, while he was driving, he also saw her following him in a vehicle. Bales eventually discussed Glaeser's behavior with the management at the YMCA. Marla Grimes ("Grimes") worked as the welcome center manager at the YMCA and was asked by her supervisor to monitor this situation.

{¶4} Grimes testified that, through the spring and summer of 2022, Glaeser would come into the YMCA shortly after Bales or his girlfriend had arrived to exercise. Grimes also stated that Glaeser typically remained in Bales's vicinity and would exit the building about fifteen minutes after he left. She clarified that, while Glaeser did not come to the YMCA every time that Bales was exercising, this occurred "more frequent[ly] than not" and happened on days when Glaeser was not teaching yoga classes. (Tr. 364).

{¶5} Grimes also testified that Glaeser was not authorized to access the computer that contained the personal information of the YMCA membership. Grimes testified that, on several occasions, she had left the front desk and returned to find Glaeser on this computer. After one of these instances, Grimes saw the information for Bales's girlfriend on the screen as Glaeser walked away from the computer. Another time, Grimes saw Glaeser ask another staff member when Bales had been coming into the YMCA. Eventually, Bales began going to a different gym to exercise.

{¶6} On August 6, 2022, Bales went to the Galion Police Department to report that "he was being stalked and harassed" by Glaeser. (Tr. 259). In response, Officer Alec Thomas ("Officer Thomas") contacted Glaeser "to give her a warning" that she "could potentially face charges" if this behavior continued. (Tr. 260). Glaeser told Officer Thomas that Bales had been following her. Bales testified that he obtained an ex parte civil protection order on October 13, 2022 after Glaeser "didn't stop" following him. (Tr. 167). This order was effective through April 13, 2023 and prohibited Glaeser from being within five hundred feet of Bales or any place Bales was likely to be.

{¶7} On October 17, 2022, Officer Caleb Sherman ("Officer Sherman") was dispatched to where Bales was residing after he reported seeing Glaeser drive past his house in a white pickup truck. When Officer Sherman arrived at the intersection south of Bales's residence, he noticed a white pickup truck that matched Bales's description was parked on the side of the road "pull[] off." (Tr. 219). He then followed the pickup truck and effectuated a traffic stop when the driver failed to use a turn signal.

{¶8} Officer Sherman then approached the vehicle and identified Glaeser as the driver. Glaeser told the police that she did not know where Bales was living at that time but acknowledged that she was aware of the civil protection order that had been issued. Bales then gave the police two videos from his phone in which the white pickup truck that Glaeser was driving could be seen going past his house.

**{¶9}** Glaeser was indicted for this conduct on November 1, 2022. This indictment included two counts of menacing by stalking in violation of R.C. 2903.211(A)(1), fourth-degree felonies; one count of violating a protection order in violation of R.C. 2919.27(A)(1), a fifth-degree felony; and one count of violating a protection order in violation of R.C. 2919.27(A)(1), a third-degree felony. These charges became the basis of Case No. 22-CR-0363.

**{¶10}** On November 8, 2022, Bales called the police as he was driving down U.S. Route 598 because he saw that Glaeser was following his vehicle. The dispatcher told Bales to drive towards a nearby Speedway station where a police officer was located in his cruiser. Bales testified that Glaeser continued to follow him as he rerouted his vehicle towards the gas station and that he saw her get pulled over by the police. Lieutenant John Bourne ("Lt. Bourne") was the officer who effectuated this traffic stop. Glaeser reported that she had been visiting a friend and was not following Bales.

**{¶11}** Glaeser was indicted for this conduct on November 15, 2022. This second indictment included one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a fourth-degree felony, and one count of violating a protection order in violation of R.C. 2919.27(A)(1), a fifth-degree felony. These charges became the basis of Case No. 22-CR-0380.

**{¶12}** On November 21, 2022, Bales again called the police to report Glaeser. He testified that he had "switched gyms" and saw Glaeser "drive back and

forth by the gym." (Tr. 178). In response, Lt. Bourne went to Glaeser's house to discuss this complaint and spoke with her fiancé, Tim Monaco ("Monaco"). During this conversation, Monaco stated that he had video camera footage that proved Glaeser had not left the house that day. The police asked for this footage but Monaco never turned over the requested recordings.

{¶13} Glaeser was indicted for her conduct in this incident on December 6, 2022. This third indictment included one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a fourth-degree felony. This charge became the basis of Case No. 22-CR-0397.

{¶14} On March 9, 2023, Bales obtained a civil protection order that was effective until January 19, 2024 and prohibited Glaeser from being within five hundred feet of him. In this timeframe, Glaeser was briefly under house arrest. For this reason, law enforcement installed a "hidden camera" near Glaeser's residence. (Tr. 532). During this time, she was required to notify the police when she left her house and when she returned.

{¶15} On June 7, 2023, Officer Austin Chaplin ("Officer Chaplin") responded to another report that Glaeser was violating a civil protection order by driving her vehicle in the vicinity of Bales's residence. After observing her "dr[i]ve off," the police followed Glaeser until she pulled over into a parking lot. Officer Chaplin testified that Glaeser reported that she had pulled into the parking lot because she was having a "sneezing fit" and that "she was on her way to or from a

doctor's appointment in Bucyrus . . . ." (Tr. 352-353). She also stated that she knew there were "more direct routes" than the one she had chosen to go to her appointment. Glaeser was subsequently arrested.

{¶16} On June 19, 2023, the police responded to a report that Glaeser was present at a medical office where Bales was receiving physical therapy. When Officer Kevin Schafer ("Officer Schafer") arrived, he was not able to locate Glaeser in the parking lot. He learned that Glaeser had been at this facility for an earlier appointment. But when her appointment had ended, Glaeser had reportedly remained in her vehicle and then returned to the sidewalk outside of the building after Bales had arrived for his appointment.

{¶17} The police located Glaeser's car in the parking lot but were unable to locate Glaeser. For this reason, the police left the scene. Roughly ten to fifteen minutes later, the officers were "redispatched" to the medical facility after the staff reported seeing Glaeser walk from a location north of their building to her vehicle in the parking lot. (Tr. 234). Officer Sherman arrived at the scene as Glaeser was attempting to drive out of the parking lot and blocked her vehicle with his cruiser. Glaeser was subsequently arrested by the police.

{¶18} On June 20, 2023, Glaeser was indicted over the incidents that occurred on June 7 and June 19, 2023. This fourth set of charges included one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a fourth-degree felony; two counts of violating a protection order in violation of R.C. 2919.27(A)(1), fifth-

degree felonies; and one count of aggravated menacing in violation of R.C. 2903.21(A), a first-degree misdemeanor. These charges became the basis of Case No. 23-CR-0179.

{¶19} On August 3, 2023, the State filed motions to join the four pending cases against Glaeser. Over Glaeser's objection, the trial court granted the motions to consolidate these cases on August 28, 2023 and ordered these eleven charges to proceed under Case No. 22-CR-0363.

{¶20} On November 29, 2023, a jury trial commenced on these charges. Bales, Glaeser, and Monaco testified at trial in addition to several of the responding officers who had been involved in this case. At the close of the State's case-in-chief, the trial court granted Glaeser's Crim.R. 29 motion as to the only charge for aggravated menacing. On December 1, 2023, the jury found Glaeser guilty of three counts of violating a protection order and one count of menacing by stalking.[1] Glaeser was not found guilty of the remaining six charges. The trial court issued its judgment entry of sentencing on January 24, 2024.

{¶21} Glaeser filed her notice of appeal on February 16, 2024. She raises the following five assignments of error:

**First Assignment of Error**

**The trial court erred by ordering consolidation of the four (4) separate cases to the substantial prejudice of Appellant Glaeser.**

---

[1] The first count of violating a protection order that led to a conviction occurred on October 17, 2022 and was initially charged in Case No. 22-CR-0363. The remaining three counts that led to convictions occurred on June 7, 2023 or June 19, 2023 and were initially charged in Case No. 23-CR-0179.

**Second Assignment of Error**

**The trial court erred when it denied Appellant Glaeser's Criminal Rule 29 Motion to Dismiss.**

**Third Assignment of Error**

**The jury and trial court erred in convicting Appellant Glaeser as the verdicts were not supported by the manifest weight of the evidence.**

**Fourth Assignment of Error**

**The trial court erred to the substantial prejudice of Appellant Glaeser by limiting Appellant's questioning of the alleged victim on cross-examination.**

**Fifth Assignment of Error**

**The trial court erred to the substantial prejudice of Appellant Glaeser by permitting the State to call a rebuttal witness on issues that State raised itself on cross-examination.**

*First Assignment of Error*

**{¶22}** Glaeser argues that the trial court erred by joining the four cases that were pending against her into Case No. 22-CR-0363.

Legal Standard

**{¶23}** Under Crim.R. 13, trial courts "may order two or more indictments . . . to be tried together, if the offenses . . . could have been joined in a single indictment." Crim.R. 13. In turn, "Crim.R. 8(A) provides the standards for determining whether separate offenses can be charged in the same indictment . . . ."

*State v. Gordon*, 2018-Ohio-259, ¶ 18.  Crim.R. 8(A) reads, in its relevant part, as follows:

> Two or more offenses may be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

Crim.R. 8(A).  As a general matter, "[t]he law favors joining multiple criminal offenses in a single trial." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).  "This is because joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *Gordon* at ¶ 18, quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968).

{¶24} However, "if it appears that a criminal defendant would be prejudiced by such joinder, then the trial court is required to order separate trials." *State v. Valentine*, 2019-Ohio-2243, ¶ 43 (5th Dist.).  *See* Crim.R. 14.  A defendant's claims of prejudice resulting from the joinder of cases are evaluated under "the 'other acts' test" and "the 'simple and direct' test." *State v. Husdon*, 2022-Ohio-3253, ¶ 19 (2d Dist.).  "The two tests are disjunctive . . . ." *Id*., citing *State v. Mills*, 62 Ohio St.3d 357, 362 (1992).  Thus, if the simple and direct test is met, the requirements of "the stricter 'other acts' test" do not need to be satisfied. *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000).  Further, "an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *Id*.

**{¶25}** Under the other acts test, a "claim of prejudice is negated when . . . evidence of the other crimes would have been admissible as 'other acts' evidence under Evid.R. 404(B) . . . ." *State v. Gideon*, 2021-Ohio-1863, ¶ 7 (3d Dist.), quoting *State v. Ahmed*, 2005-Ohio-2999, ¶ 22 (8th Dist.). Under Evid.R. 404(B), other acts "evidence may be used to establish 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *State v. Bruce*, 2023-Ohio-3298, ¶ 19 (3d Dist.), quoting Evid.R. 404(B)(2).

**{¶26}** In determining whether other-acts evidence is admissible, courts must consider (1) whether the other acts evidence is "relevant to making any fact that is of consequence . . . more or less probable than it would be without the evidence"; (2) whether the other acts evidence is presented for a "legitimate purpose"; (3) and whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *State v. Williams*, 2021-Ohio-256, 16 (3d Dist.), quoting *State v. Williams*, 2012-Ohio-5695, ¶ 19-20. The rationale behind the other-acts test for joinder is that, where the evidence in one case would be admissible as other acts evidence in another case, no prejudice results from a joint trial because the jury would have heard the same evidence if the cases had been tried separately. *State v. Bradshaw*, 2023-Ohio-1244, ¶ 13 (3d Dist.).

**{¶27}** Under the simple and direct test, a claim of prejudice is negated when the offenses subject to joinder are "simple and direct, so that a jury is capable of

segregating the proof required for each offense." *State v. Shook*, 2014-Ohio-3987,

¶ 21 (3d Dist.), quoting *State v. Fletcher*, 2004-Ohio-4517, ¶ 41 (2d Dist.).

> Evidence is 'simple and direct' if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would 'improperly consider testimony on one offense as corroborative of the other.'

*Gideon* at ¶ 9, quoting *Valentine*, 2019-Ohio-2243, at ¶ 47, quoting *State v. Wright*,

2017-Ohio-8702, ¶ 9 (4th Dist.). In part, this test is applied "to prevent the finder

of fact from confusing the offenses." *State v. Varney*, 2008-Ohio-5283, ¶ 19 (4th

Dist.). "Ohio appellate courts routinely find no prejudicial joinder where the

evidence is presented in an orderly fashion as to the separate offenses or victims

without significant overlap or conflation of proof." *Bradshaw*, 2023-Ohio-1244, ¶

13, quoting *State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).

### Standard of Review

{¶28} "Issues of joinder and severance are generally reviewed under an

abuse of discretion standard." *State v. Plott*, 2017-Ohio-38, ¶ 52 (3d Dist.).

Additionally, "[a] defendant claiming error based upon the trial court's refusal to

allow separate trials has the burden of affirmatively showing that his rights were

prejudiced." *State v. McBride*, 2011-Ohio-1490, ¶ 10 (10th Dist.).

### Legal Analysis

{¶29} In this case, the State filed a motion to join the four cases against

Glaeser, arguing that the offenses charged in the indictments were "based on a

common scheme or plan" and were "part of a course of criminal conduct." (Doc. A33). The trial court issued an order that joined these four cases into Case No. 22-CR-0363 for trial pursuant to Civ.R. 8. On appeal, Glaeser argues that she was prejudiced by the joinder of these cases under both of the applicable tests.

{¶30} In applying the simple-and-direct test, we begin by noting that the four indictments arose from five main incidents in which Glaeser was reportedly following Bales in violation of a civil protection order that required her to maintain a distance of five hundred feet. The alleged offenses arose from separate incidents in different locations and generally involved different responding officers. *See Valentine*, 2019-Ohio-2243, ¶ 49. The evidence produced to substantiate these offenses was neither complex nor confusing. *See State v. Willis*, 2019-Ohio-537, ¶ 18 (8th Dist.) (considering the complexity of the offenses and evidence in applying the simple-and-direct test).

{¶31} In its jury instructions, the trial court also admonished the jurors to consider "the evidence applicable to each count separately" and to ensure that their "findings as to each count [be] uninfluenced" by the verdicts rendered "in the other count[s]." (Tr. 617). As a general matter, courts presume that a jury followed the trial court's instructions. *State v. Rawlins*, 2024-Ohio-1733, ¶ 26 (3d Dist.). In this case, nothing in the record leads us to dispense with this general presumption. In fact, the jury acquitted Glaser of six of the charges against her, which strongly suggests that they were able to "segregate the proof" for the various alleged offenses

and draw separate conclusions for each of the different counts that were tried. *Bradshaw*, 2023-Ohio-1244, ¶ 15. Having examined the evidence in the record, we conclude that the evidence was simple and direct.

**{¶32}** Since the simple-and-direct test is satisfied in this case, Glaeser cannot demonstrate prejudice, and we need not consider the other-acts test. Nonetheless, we note that each of the four cases that were consolidated contained at least one charge of menacing by stalking. This particular offense requires the State to prove that the defendant, "by engaging in a *pattern of conduct*, knowingly cause[d] another person to believe that the offender will cause physical harm to the other person . . . or cause mental distress to the other person or a family or household member of the other person." (Emphasis added.) R.C. 2903.211(A)(1). In addressing this element, the Ohio Supreme Court has held that

> [o]ther acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress.

*State v. Spaulding*, 2016-Ohio-8126, ¶ 114, quoting *State v. Bilder*, 99 Ohio App.3d 653, 658 (9th Dist. 1994). *See State v. Simmons*, 2023-Ohio-2957, ¶ 26 (8th Dist.).

**{¶33}** If these four cases had remained separate, the State would have had to prove that Glaeser engaged in a "pattern of conduct" to establish a charge of menacing by stalking in each of the resulting four trials. R.C. 2903.211(A)(1). On appeal, the State persuasively argues that the five main incidents that gave rise to

the four indictments constituted the "pattern of conduct" and that the evidence of these five main incidents would have, therefore, been introduced at each of the four trials to establish the "pattern of conduct."

{¶34} In a similar vein, Evid.R. 404(B)(2) states that the permitted uses of other acts evidence include establishing intent and the lack of accident. In this case, the evidence of these five different incidents was probative to establishing whether these "otherwise innocent appearing acts" were "knowing attempts to cause [Bales] mental distress." *Spaulding*, 2016-Ohio-8126, ¶ 114. We also note that the Defense suggested that Glaeser was not intentionally within the prohibited radius of Bales or his residence and that her proximity to him in these situations was accidental. Thus, even if these cases had remained separate, several bases existed for admitting the evidence of these five incidents in the resulting four trials. While the simple-and-direct test provides a basis to find that Glaeser was not prejudiced by the joinder of these cases, we also conclude that the other-acts test is satisfied in this case.

{¶35} Having examined the evidence in the record, we conclude that Glaeser has failed to demonstrate that she was prejudiced by the joinder of these four cases. Further, the record contains no indication that the trial court abused its discretion in directing these charges in these four indictments to be tried together as one case. Accordingly, the first assignment is overruled.

*Second Assignment of Error*

**{¶36}** Glaeser argues that her conviction for menacing by stalking is not supported by sufficient evidence and is against the manifest weight of the evidence.[2]

Legal Standard

**{¶37}** "A sufficiency-of-the-evidence analysis examines whether the State has carried its burden of production at trial." *State v. Whitt*, 2025-Ohio-424, ¶ 16 (3d Dist.). "On review, an appellate court is not to consider whether the evidence at trial should be believed but whether the evidence, if believed, could provide a legal basis for the finder of fact to conclude that the defendant is guilty of the crime charged." *State v. Daniels*, 2024-Ohio-1536, ¶ 13 (3d Dist.).

> Accordingly, the applicable standard 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.'

*State v. Reed*, 2024-Ohio-4838, ¶ 30 (3d Dist.), quoting *Plott*, 2017-Ohio-38, ¶ 62.

**{¶38}** Further, "[a] manifest-weight analysis examines whether the State has carried its burden of persuasion at trial." *State v. Carroll*, 2024-Ohio-1626, ¶ 58 (3d Dist.). On review, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *State v. Harvey*, 2020-Ohio-329, ¶ 12 (3d Dist.), quoting *Plott* at ¶ 73.

---

[2] Glaeser raises the manifest-weight challenge against her conviction for menacing by stalking under her third assignment of error. However, we will consider this argument alongside our analysis of her sufficiency argument for the sake of clarity.

Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶39}** In this analysis, "the credibility of witnesses is primarily a determination for the trier of fact." *State v. Morris*, 2022-Ohio-3608, ¶ 41 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.). For this reason, an appellate court must "allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 2014-Ohio-5320, ¶ 7 (3d Dist.). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Hunter*, 2011-Ohio-6524, ¶ 119, quoting *Thompkins* at 387.

**{¶40}** To obtain a conviction for menacing by stalking in violation of R.C. 2903.211(A)(1), the State must prove that the defendant, "by engaging in a pattern of conduct . . . knowingly cause[d] another person to believe that the offender will cause physical harm to the other person . . . or cause mental distress to the other person or a family or household member of the other person." A violation of this provision is a felony of the fourth degree if the defendant "previously has been

convicted of or pleaded guilty to a violation of" R.C. 2903.211 or R.C. 2911.211. R.C. 2903.211(B)(2).

Legal Analysis

{¶41} In this case, Glaeser was convicted of one count of menacing by stalking. The charge that led to this conviction came in the indictment that was issued on June 20, 2023. On appeal, she argues that the State failed to establish that she acted with the requisite mental state and that Bales suffered from any mental distress that fits the statutory definition provided in R.C. 2903.211(D)(2).

{¶42} To establish the mens rea element, the State had to establish that Glaeser acted knowingly. The Ohio Revised Code states that

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

R.C. 2901.22(B). Bales's testimony indicates that he repeatedly saw Glaeser following him around Galion for over a year. He stated that, for a period of time, he saw her "every day . . . . either in her car or truck circling [his] . . . apartment." (Tr. 176). Grimes also testified that she observed Glaeser frequently entering the YMCA shortly after Bales had arrived and then lingering in the areas of the gym where he was exercising. Grimes also stated that Glaeser was warned not to follow Bales at the YMCA.

{¶43} Further, Officer Thomas testified that he contacted Glaeser to issue her a warning after Bales filed a report with the police. Bales testified that, when he continued seeing Glaeser "dr[i]ve by constantly," he obtained a civil protection order against her. (Tr. 164). At trial, five police officers provided testimony about responding to five separate incidents in which Bales reported that Glaeser was following him. On four of these occasions, Glaeser was located in close proximity to Bales's location or his residence. The testimony from these police officers also indicated that, on more than one occasion, Glaeser appeared to be driving away as soon as a police cruiser appeared on the scene.

{¶44} Importantly, Bales and these five police officers described Glaeser engaging in similar conduct across these incidents. Thus, Glaeser persisted in this behavior over a period of months even as she was issued multiple warnings from the police; was served with a civil protection order; and was indicted on four different occasions for this conduct. Based on this testimony, a rational finder of fact could conclude that Glaeser was acting knowingly.

{¶45} To establish the second element challenged on appeal, the State had to prove that Glaeser caused Bales mental distress. As an initial matter, this Court has held that the wording of the R.C. 2903.211(A)(1) does not require the State to establish "that the victim actually suffered mental harm" but only requires evidence that establishes "a defendant knowingly caused the victim to believe that [s]he would cause h[im] mental distress . . . ." *State v. Rasawehr*, 2020-Ohio-429, ¶ 22

(3d Dist.), quoting *State v. Beckwith*, 2017-Ohio-4298, ¶ 14 (8th Dist.). *See Griga v. DiBenedetto*, 2012-Ohio-6097, ¶ 5-7, 13 (1st Dist.). *But see R.G. v. R.M.*, 2017-Ohio-8918, ¶ 14-15 (7th Dist.).[3]

Further, the Ohio Revised Code defines "mental distress" as

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2). To establish this element, the prosecution "does not need to prove . . . that a person requested or received psychiatric treatment, psychological treatment, or other mental health services in order to show that the person was caused mental distress . . . ." R.C. 2903.211(E).

**{¶46}** "Mental distress need not be incapacitating or debilitating . . . [, and] expert testimony is not required to find mental distress." *State v. Crawl*, 2024-Ohio-752, ¶ 22 (2d Dist.), quoting *Perry v. Joseph*, 2008-Ohio-1107, ¶ 8 (10th Dist.). Further, "[i]ncapacity is substantial if it has a significant impact upon the victim's daily life." *State v. Willett*, 2012-Ohio-1027, ¶ 10 (9th Dist.), quoting *State v. Payne*, 2008-Ohio-5447, ¶ 9 (9th Dist.). Thus, "'[e]vidence of changed routine can

---

[3] We are aware that the Ohio Supreme Court has taken a case to address a certified conflict as to "[w]hether R.C. 2903 .211(A)(1) requires a victim to actually experience mental distress or only believe that the stalker will cause the victim physical harm or mental distress, for a court to issue a civil stalking protection order." *Z.J. v. R.M.*, 2024-Ohio-1507. Since this conflict has not yet been resolved, we proceed with the position of our district as set forth in *Rasawehr*, 2020-Ohio-429, ¶ 22.

support a finding of mental distress' . . . . [as] can evidence that the complainant involved the police." *State v. Kronenberg*, 2024-Ohio-4673, ¶ 27 (8th Dist.), quoting *Morton v. Pyles*, 2012-Ohio-5343, ¶ 15 (7th Dist.).

**{¶47}** At trial, Bales affirmed that he exchanged "suggestive text messages" with Glaeser while he was separated from his wife but that they never progressed into a "physical relationship." (Tr. 184). He stated that Glaeser began following him when he stopped texting her and began a relationship with another woman. When asked how Glaeser's behavior affected him, Bales stated the following:

> It was just a constant looking over my shoulder, just anxious, you know, anxious. I've . . . gone online to check my ratings [for his handyman business] and people that I have never even worked for had made complaints against me saying that I do shoddy work or a high schooler did the work and the name was on it was a person that I had never done a job for. And then it is just—it has affected my work. It has affected my homelife. It has affected me.
>
> . . . .
>
> I think it was just . . . to ruin my name. I think that's what she was attempting to do . . . . she took it—she took it personally that I, you know, that I did not want to have any type of relationship . . . .

(Tr. 184-185). Bales also testified that he observed Glaeser "holding her phone up taking pictures . . . videos" while he was working on houses as a handyman. (Tr. 165). He later saw these videos posted online by an anonymous TikTok account that called him "a cheating husband." (Tr. 166).

**{¶48}** Bales testified that Glaeser's conduct was also directed at his girlfriend and his wife. He stated that Glaeser called his girlfriend's employer, Ohio

Health, and accused her of improperly disclosing patient information. He also stated that his wife was a physician and that Glaeser made a complaint to a state agency that accused her of improperly disclosing patient information. Glaeser also raised this same complaint with his wife's employer. Bales testified that subsequent investigations into these allegations concluded that Glaeser's complaints were unsubstantiated.

{¶49} Bales further testified that he routinely went to the YMCA to exercise and that Glaeser would show up "within ten minutes" of his arrival at that facility. (Tr. 160). He testified that, even though he changed the times he went to the YMCA, she continued to "show up every time." (Tr. 160). He "eventually switched gyms" because he wanted to "tak[e] [him]self out of that situation." (Tr. 160-161). However, he subsequently saw Glaeser "constantly drive back and forth" in front of his new gym. (Tr. 178).

{¶50} Further, Bales's testimony indicates Glaeser followed him for over one year and daily during some timeframes. He testified that this behavior continued even though he filed multiple police reports; obtained a civil protection order; and called the police requesting assistance while she was following him on multiple occasions. In conjunction with the other evidence in this analysis, Bales's testimony that he was "looking over [his] . . . shoulder" and feared that Glaeser was trying to "ruin" him is sufficient to establish the mental distress element of this offense. (Tr. 185).

**{¶51}** Having viewed the materials in the record in a light favorable to the State, we conclude that a rational trier of fact could conclude that the prosecution produced evidence to establish the mens rea and mental distress elements of this offense. Thus, Glaeser's arguments fail to establish that her conviction for menacing by stalking is not supported by sufficient evidence.

**{¶52}** As to the manifest weight of the evidence, Glaeser testified that, after her relationship with Bales became inappropriate, she "confronted him and . . . asked him nicely to stop contacting . . . [her], stop harassing . . . [her], stop showing up" where she was located. (Tr. 427). For this reason, she reported being shocked when she was contacted by the police and notified that Bales had filed a complaint against her on August 6, 2022. She also testified that she was unaware of where Bales lived in this timeframe.

**{¶53}** Glaeser further testified that she was in the vicinity of Bales's residence on October 17, 2022 because she was visiting a friend who lived in that area. She stated that, on June 7, 2023, she was in the vicinity of Bales's residence because of driving to a doctor's appointment in Bucyrus. Glaeser indicated that the backroads that brought her close to Bales's residence were not the most direct way to get to Bucyrus. But she explained that she was on these backroads as she felt faint and did not want to cause an accident on a highway. Glaeser stated that, on June 19, 2023, she was at the medical office at the same time as Bales because she had an appointment that morning.

**{¶54}** Glaeser testified that she filed complaints against Bales's wife and girlfriend because she overheard people speaking about her medical condition and believed that someone had to have improperly accessed her personal information. Monaco testified that he saw Bales take video of him as he drove around Galion in his white pickup. He stated that Glaeser had driven his white pickup truck on one occasion. Having examined the evidence presented at trial, we find no indication that the jury lost its way and returned a verdict that was against the manifest weight of the evidence.

**{¶55}** In conclusion, the State produced sufficient evidence to substantiate the mens rea and mental distress elements of this offense. Further, the evidence presented by the parties does not weigh heavily against Glaeser's conviction for menacing by stalking. Accordingly, the second assignment of error is overruled.

*Third Assignment of Error*

**{¶56}** Glaeser raises several specific arguments that assert her three convictions for violating a protection order are not supported by sufficient evidence and are against the manifest weight of the evidence.[4]

Legal Standard

**{¶57}** We reincorporate the manifest-weight and sufficiency-of-the-evidence standards set forth under the second assignment of error. Further, to obtain

---

[4] While the text of this assignment of error only asserts a manifest-weight challenge, the body of this argument expressly raises several overlapping sufficiency-of-the-evidence challenges. For this reason, we will consider these arguments under both of these standards.

a conviction for violating a protection order in violation of R.C. 2919.27(A), the State must prove that the defendant "recklessly violate[d] the terms of . . . [a] protection order . . . ." R.C. 2901.22(C) states that

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.

A violation of R.C. 2919.27 constitutes a fifth-degree felony if the defendant has a prior conviction for violating a protection order. R.C. 2919.27(B)(3).

### Legal Analysis

**{¶58}** Glaeser argues her three convictions for violating a protection order were against the manifest weight of the evidence. These convictions arose from the third, ninth, and tenth counts presented to the jury. For each of these convictions, Glaeser argues (1) that she was not properly identified as the individual appearing in proximity to Bales; (2) that precise measurements of her proximity to Bales were not presented at trial; and (3) that the State failed to establish that she acted recklessly. We turn to examining the evidence relevant to these arguments.

**{¶59}** The third count tried in this case charged Glaeser with violating a protection order on October 17, 2022. As to this incident, Bales testified that he observed Glaeser driving past his residence in a white pickup truck. He then used his phone to take videos of her vehicle passing his residence. These videos were played for the jury at trial. Officer Sherman testified that he responded to Bales's

report and located Glaeser parked in a white pickup truck at the intersection south of his residence. The State played an audio recording of Officer Sherman's conversation with Glaeser that was captured by his body camera. When Glaeser testified at trial, she did not deny being in the vicinity of Bales's house but denied knowing where he lived.

{¶60} As to the distance from his residence, Bales testified that he saw Glaeser going past his residence and also saw the white pickup truck she was driving parked "75 to 100" yards from where he lived. (Tr. 177). As to the element of recklessness, Glaeser testified that she was in the vicinity of Bales's residence because she was visiting a friend who lived on a nearby street. On cross-examination, Officer Sherman indicated that Bales's address was not listed on the civil protection order and stated that Glaeser denied knowing where Bales was residing at that time. However, Bales testified that his residence "wasn't hard to find" because he only lived "a block from the gym" and that he parked his truck outside of his residence. (Tr. 169).

{¶61} Further, Officer Sherman testified that, as soon as his police cruiser came into view at the intersection, he observed Glaeser "pull[] off at a faster rate of speed" and "turn[] immediately onto that first side road . . . ." (Tr. 221). Bales also testified that he watched Glaeser's vehicle until she drove away as the police cruiser arrived at the intersection. Having evaluated the relevant evidence, we conclude

that Glaeser's arguments against this conviction for violating a protection order are without merit.

{¶62} The ninth count tried in this case charged Glaeser with violating a protection order on June 7, 2023. At trial, Bales testified that his marital residence was located one lot away from the intersection of Brandt and Biddle. Bales testified that, while he was separated from his wife when he met Glaeser, he later reconciled with his wife. Further, Bales testified that his account at the YMCA listed his address on Biddle. Grimes testified that she had observed Glaeser searching the personal information of the gym patrons on the YMCA computer. Grimes stated that she checked which accounts had been recently accessed after she saw Glaeser behind the front desk on the computer. Grimes stated that Bales's account was the page that had been visited just before Glaeser left the kiosk.

{¶63} Further, the testimony at trial indicated that Officer Petri had been "driving on Biddle or Brandt Road" and located Glaeser in her vehicle. (Tr. 352). In response, Officer Petri "[t]urned around to stop her" and noticed that Glaeser "drove off." (Tr. 352). He then followed her vehicle until she pulled into the Sleepy Inn parking lot. Officer Chaplin was dispatched to assist Officer Petri in addressing a reported civil protection order violation.

{¶64} Officer Chaplin testified that, when Glaeser was asked why she was in the vicinity of Bales's residence, she stated that she was going to a doctor's appointment in Bucyrus. The officers noted that she lived in Galion and inquired

into why she would take an indirect route to Bucyrus that took her in the vicinity of Bales's residence. Glaeser stated that "she always goes that direction even though there is [sic] more direct routes by taking 30 or going down State Route 19." (Tr. 353). On cross-examination, she detailed the route she took and indicated that she was at the locations alleged by the State.

{¶65} Officer Chaplin also testified that Glaeser stated that she had pulled into the Sleepy Inn parking lot "because she was having a sneezing fit." (Tr. 352). While testifying in her defense, Glaeser stated that she pulled into the Sleepy Inn parking lot because she "started to feel sick" and thought about calling 9-1-1. (Tr. 437). Glaeser also stated that she stayed away from the main roads because she "wasn't feeling well" and thought she was "starting to lose [her] . . . vision." (Tr. 436). Having evaluated the relevant evidence, we conclude that Glaeser's arguments against this conviction for violating a protection order are without merit.

{¶66} The tenth count tried in this case charged Glaeser with violating a protection order on June 19, 2023. As to this incident, Officer Schafer testified that he was dispatched to a medical office where Glaeser was reportedly loitering on the premises while Bales was at an appointment. After the police arrived, they could not locate Glaeser, though her vehicle was in the parking lot. The police left the scene only to return after the staff at the medical office reported that Glaeser had returned to the parking lot. Officer Schafer testified that, on their return to the scene,

Glaeser was located and arrested. During her testimony, Glaeser admitted that she was at the medical office at this time.

{¶67} As to the distance element, the testimony at trial indicated that Glaeser left after her appointment ended but "came back in" the office around the time that Bales arrived. (Tr. 336). While Bales did not see her on this occasion, the testimony produced at trial indicates that the lobby was divided into two areas by a fish tank. One side of this lobby was for physical therapy appointments while the other side was for primary care appointments. While Glaeser was on one side of this fish tank in the lobby, Bales went in one of the back rooms.

{¶68} As to the recklessness element, Bales explained at trial that he and Glaeser went to the same office for physical therapy. He had requested that their appointments be scheduled at different times. But Bales testified that, when he arrived for his appointment on June 19, 2023, he was informed that Glaeser's appointment had concluded roughly an hour earlier but that she had been loitering in the parking lot.

{¶69} Officer Schafer testified that he learned that Glaeser was in the office and that, after Bales had arrived, she walked around the parking lot and sidewalk area. He also testified that the police looked for Glaeser in the parking but left after they were unable to locate her. However, the staff reported that, once the police had left, Glaeser returned to the parking lot, walking from a location that was north of the medical office. Officer Sherman testified that, when he returned to the parking

lot, he saw Glaeser trying to drive out of the parking lot and that he blocked her vehicle from leaving with his cruiser.

{¶70} Glaeser testified at trial that she was at the medical office for physical therapy and was at her appointment while the police were attempting to locate her in the parking lot. She stated that when the police blocked her car in the parking lot she was leaving the medical office because her appointment had concluded. On cross-examination, Officer Schafer testified that he did not check the back offices for Glaser and the police searched for her in the parking lot. In examining this testimony, we note that the jurors were free, as the trier of fact, to reject this testimony in favor of the evidence that suggested she was loitering in the parking lot. *State v. Greer*, 2024-Ohio-694, ¶ 27 (3d Dist.). Having evaluated the relevant evidence, we conclude that Glaeser's arguments against this conviction for violating a protection order are without merit.

{¶71} After viewing the evidence in a light most favorable to the State, we conclude that the prosecution produced some evidence to substantiate each of the elements of these three convictions that Glaeser challenges on appeal. Further, having examined the evidence in the record on the basis of its weight and credibility, we find no indication that the jury lost its way and returned a verdict that was against the manifest weight of the evidence. Accordingly, the third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶72}** Glaeser argues that the trial court erred by limiting the scope of the Defense's questioning during the victim's testimony on cross-examination.

Legal Standard

**{¶73}** "The Sixth Amendment's right to confront witnesses guarantees a criminal defendant the right to cross-examine witnesses." *Cleveland v. Hyppolite*, 2016-Ohio-7399, ¶ 33 (8th Dist.). While the Confrontation Clause requires the accused to have an "'opportunity for effective cross-examination,' it does not require trial courts to allow 'cross-examination . . . in whatever way and, to whatever extent, the defense might wish.'" *State v. Bump*, 2013-Ohio-1006, ¶ 89 (3d Dist.), quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

**{¶74}** Evid.R. 611 addresses the authority of trial courts "to control the mode and order of cross-examination . . . ." *State v. Holmes*, 2019-Ohio-2485, ¶ 55 (3d Dist.). This provision reads, in its relevant part, as follows:

> (A) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
>
> (B) Scope of Cross-Examination. Cross-examination shall be permitted on all relevant matters and matters affecting credibility.

Evid.R. 611(A), (B). Thus, trial courts may "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment,

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. McAlpin*, 2022-Ohio-1567, ¶ 151, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

### Standard of Review

**{¶75}** As a general matter, "[t]he decision to admit or exclude evidence is committed to the sound discretion of the trial court." *State v. Scott*, 2025-Ohio-419, ¶ 19 (3d Dist.). For this reason, "[t]he scope of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case." *McAlpin*, 2022-Ohio-1567, ¶ 151. An appellate court reviews a trial court's determination on the admission of evidence under an abuse of discretion standard. *Sullivan*, 2017-Ohio-8937, ¶ 20. Thus, an appellate court is not to substitute its judgment for that of the trial court but will only reverse the trial court's determination if it is unreasonable, arbitrary, or capricious. *State v. Howton*, 2017-Ohio-4349, ¶ 23 (3d Dist.).

### Legal Analysis

**{¶76}** Glaeser argues that the trial court should have permitted defense counsel to ask additional questions of Officer Thomas about a number of sexual images that she and Bales exchanged in text messages. On cross-examination, defense counsel asked Officer Thomas about what Bales had disclosed about his prior relationship with Glaeser when he made a police report on August 6, 2022. In

response, Officer Thomas affirmed that Bales did not indicate that they had exchanged text messages that were "of a sexual nature[.]" (Tr. 291).

**{¶77}** Defense counsel then sought to ask questions about whether any nude images were exchanged in these text messages. While the trial court permitted defense counsel to indicate that their communications included "[t]ext messages [that] were of a sexual nature," it did not permit a discussion of the nude images. (Tr. 279). In reaching this conclusion, the trial court stated that these nude images were not "relevant at all" and that the "slight probative value" was "drastically outweighed by the prejudicial value." (Tr. 280).

**{¶78}** Initially, we note that the record contains no indication that these texts continued into the timeframe in which Bales was complaining of being stalked and harassed by Glaeser. In fact, Bales testified that he had blocked Glaeser's number around the time that he began a relationship with another woman in April or May of 2022. Further, during his testimony, Bales had already affirmed that his communications with Glaeser became "promiscuous" and included "sexually suggestive text messages" in which they "sent pictures" to each other. (Tr. 184, 193). In light of the evidence already before the jury, Glaeser has not raised an argument on appeal that explains the probative value of extending Officer Thomas's testimony into a specific discussion of any nude images that were exchanged.

**{¶79}** Having examined the evidence in the record, we conclude that the trial court did not err in concluding that this potential line of inquiry was of "very slight"

probative value and "drastically outweighed by the prejudicial value." (Tr. 280). Thus, we conclude that the trial court did not abuse its discretion in deciding to limit the scope of cross-examination in this manner. Accordingly, the fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶80}** Glaeser argues that the trial court erred by permitting the State to call a rebuttal witness.

Legal Standard

**{¶81}** The purpose of calling a rebuttal witness is to "explain, refute, or disprove new facts introduced into evidence by the adverse party . . . .'" *Howton*, 2017-Ohio-4349, ¶ 23, quoting *State v. McNeill*, 83 Ohio St.3d 438, 446 (1998). For this reason, "[t]he testimony of a rebuttal witness is only relevant to challenge the evidence introduced by the opponent, and the scope of this testimony is limited to such evidence." *State v. Adkins*, 2004-Ohio-3627, ¶ 11 (4th Dist.). "As with other decisions to admit evidence," appellate courts "review a trial court's decision to admit rebuttal testimony for an abuse of discretion." *State v. Ross*, 2018-Ohio-3027, ¶ 26 (10th Dist.).

Legal Analysis

**{¶82}** At trial, the State identified two main topics that were broached by the Defense as the basis for calling Officer Eric Bohach ("Officer Bohach") as a rebuttal witness. First, the State pointed out that Glaeser testified in her defense that she

-34-

frequently wore dark clothing and a baseball cap. Similarly, Monaco then testified that Glaeser "wore a lot of dark outfits, baseball cap always out the door." (Tr. 482).

{¶83} Through the testimony of several of its witnesses, the State had previously suggested that Glaeser had been wearing a baseball cap and dark clothing when she was stopped by the police because such apparel would obscure her appearance while she was stalking Bales. During his rebuttal testimony, Officer Bohach testified that a camera was located across the street from Glaeser's residence. He stated that he observed the footage from this camera and testified about how frequently Glaeser wore dark clothing and a baseball cap.

{¶84} Second, Monaco testified that Glaeser drove his white pickup truck on only one occasion. He then testified that he had observed Bales taking pictures of him driving the white pickup truck around Galion. This testimony suggested that, when Bales reported seeing the white pickup truck go past him on numerous occasions, he was, in fact, seeing Monaco driving around Galion rather than Glaeser. Based on his review of the camera footage from outside Glaeser's house, Officer Bohach provided testimony on rebuttal that discussed Glaeser's use of the white pickup truck and that contradicted Monaco's claim that she only drove this vehicle on one occasion.

{¶85} Having examined the evidence in the record, we conclude that the trial court's decision to permit Officer Bohach to testify as a rebuttal witness did not

constitute an abuse of discretion. Accordingly, the fifth assignment of error is overruled.

*Conclusion*

**{¶86}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Crawford County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**WALDICK, P.J. and MILLER, J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

John R. Willamowski, Judge

Juergen A. Waldick, Judge

Mark C. Miller, Judge

DATED:
/hls